## Phillips *against* Gregg.

The validity of a marriage is to be determined by the law of the place where it was celebrated: if valid there, it is valid everywhere.

Foreign laws cannot be judicially noticed, but must be proved as facts; and in making such proof, the general principle is applicable, that the best evidence the nature of the case admits of, must be given. But this rule may be relaxed or changed, as necessity, either physical or moral, may require, and where a rigid adherence to it may produce extreme inconvenience or manifest injustice.

If a parent purchase land in the name of his son, it will, *prima facie*, be deemed an advancement, so as to rebut the presumption of a resulting trust for the parent.

The amount of an advancement by a parent to a child must be ascertained by the value of the thing at the time of the gift. If a parent purchase land in the name of a child, the amount of the purchase-money paid, is the amount of the advancement, and not any increased value which the land may afterwards possess.

The possession of one tenant-in-common, is, *prima facie*, the possession of his co-tenant also, unless it be attended with circumstances demonstrative of an adverse intent, such as demand by his co-tenant of his share of the rent, and a refusal to pay, saying he claims the whole.

ERROR to the district court of *Allegheny* county.

Oliver O. Gregg and Christian Johnson against Elias Phillips and Jacob Poth. This was an action of ejectment for 70 acres of land on Coal Hill; consisting of nineteen coal lots, and another lot adjoining, of about 35 acres. The land was conveyed by the proprietaries to John Ormsby, Sen., by deed, dated September 7, 1791. John Ormsby, Sen. died intestate, in December 1806, leaving two of his five children, Oliver and Mrs Sidney Gregg, surviving him. Mrs. Bedford and Joseph had died, without issue, before their father. John Ormsby, Jun. had also died in 1795.

The plaintiffs claim as the purchasers of the title of Mary Swazey, who they allege is a daughter of John Ormsby, Jun., and therefore entitled to inherit the one-third of the estate of her grandfather, as tenant-in-common with Oliver Ormsby and Sidney Gregg. Oliver Ormsby died in 1832, and the landlords of defendants are his children and heirs.

The defendants relied upon three grounds of defence:

1. That Mary Swazey was not the legitimate daughter of John Ormsby, Jun., and this involved the legal objection to the sufficiency of the evidence to establish the validity of the marriage of John Ormsby, Jun.

2. That John Ormsby, Jun. had been fully advanced by his father in his lifetime. This ground of defence involved the inquiry, as of what time the value of an advancement in land is to be made, and by what rule it is to be ascertained.

3. That the plaintiffs were barred by the act of limitations: and this involved the inquiry, what acts of exclusive ownership will be evidence of adverse possession of one tenant-in-common against his co-tenant.

The evidence given upon the trial was exceedingly voluminous, but the points raised by it will be sufficiently understood by the statement of it, contained in the following charge of the court to the jury:

*Grier*, President.—The first question for your consideration is, whether Mary Swazey (the wife of Gabriel Swazey) was one of the heirs at law of John Ormsby, Sen. It is admitted that John Ormsby, Sen. had five children, two of whom (Mrs Bedford and Joseph Ormsby) died before their father, and without issue. Oliver Ormsby and his sister (Mrs Sidney Gregg) survived their father. John Ormsby, Jun. (the other son) also died before his father; and the plaintiffs claim, that Mary Swazey was the daughter and only child of John Ormsby, Jun. and is therefore entitled to the one-third of the estate of her grandfather, John Ormsby, Sen. That this Mary Swazey is the daughter of John Ormsby, by his reputed wife, (Lydia, daughter of Nathan Swazey,) is clearly proved, and has not been seriously denied. But defendant's counsel contend, that there is no evidence, or at least not sufficient evidence, that the marriage of John Ormsby with Lydia Swazey was valid. And as the learned counsel have condensed their able argument on this subject into a number of points, on which they have prayed the opinion of the court, it will be best, perhaps, to examine this subject, with reference to them. And we answer to these points:

1. They contend that (as between persons *sui-juris*) marriage is to be decided as to the law of the place where it is celebrated. If valid there, it is everywhere. It has a legal ubiquity of obligation; if invalid there, it is equally invalid everywhere.

2. If it be insisted that marriage has been solemnized according to the laws of the country where the marriage took place, it is necessary to prove what the law of that country was.

3. The existence of a foreign law or custom, is to be proved (as a matter of fact) by evidence to show what the law or custom is, and the court cannot presume that the law of a foreign country agrees with the law of our own in any particular point.

4. Marriage is a contract *sui generis*, which is regulated not by private contract, but by public laws of the state, which are imperative on all who are domiciled within its territory.

5. The *onus* of proof of a foreign law, like the burden of proof of other facts resting upon the party who claims, by virtue of a contract alleged to be made in conformity to it, he must prove it by competent testimony; if written, by documentary evidence; if unwritten, by the attestation of tribunals, or proofs of persons in a situation to be conversant with it; and in the absence of such testimony, he must be considered as failing in his proof.

6. The marriage between John Ormsby, Jun. and Lydia Swazey

[Phillips v. Gregg.]

(the mother of the plaintiff) is alleged by Mrs. Sarah Swazey to have taken place some time before 1791. In answer to the third interrogatory, she says: " That John Ormsby married Lydia Swazey about forty years since; that they were married by Justice King, who was duly authorized to do so by the Spanish government, and who was in the habit at that time of marrying a great number of persons; that she was present at the marriage, and waited as bridesmaid upon Ormsby's wife; that he lived with his wife about three years after his marriage, during which time the said Mary was born." The court is requested to charge the jury, that supposing these to be the facts of the case, there is no sufficient proof before them of the validity of the alleged marriage; that at the time of the alleged marriage, the country of the domicil of the parties was under the government and jurisdiction *de facto* of the king of Spain; that the validity of such marriage must be tested by Spanish laws; that foreign laws must be established by professors of the law of the country, or that the law regulating marriage must be procured and shown to be the existing law of the country at the time.

7. That the declaration of the parties, common reputation of the country, and cohabitation, and birth of the children during cohabitation, although circumstances from which a marriage may be presumed, in absence of direct testimony, of the fact of marriage; yet when the marriage ceremonies of the act are fully testified to, it is incumbent on the parties alleging the marriage, to show that it was performed in conformity to the law of the domicil; and failing to do that, the proof of the legitimacy of the offspring of such cohabitation entirely fails.

8. That taking all the evidence given in this case to be true, there is no fact or accumulation of facts, from which the jury can infer the validity of the alleged marriage between John Ormsby, Jun. and Lydia Swazey.

9. That if any just inference can be drawn from the facts of the case, in relation to the alleged marriage, it must be against the validity.

10. That there is no proof that the marriage alleged to have taken place between John Ormsby, Jun. and Lydia Swazey, was a valid marriage, according to the law of the domicil.

In answer to these points, the court instruct you—

That the first five correctly state the general principles of the law on this subject, although subject to many exceptions, not necessary to be here enumerated. *Story's Conflict of Laws, sects.* 118, 119, 120, &c.

But the court are not prepared to concur in all the inferences, or the results which are alleged necessarily to follow in their application to the present case, as drawn by the learned counsel, in the last five points.

It is true that by the evidence in this case, the Natchez country (as it was then called), in which this marriage was contracted, was

[Phillips v. Gregg.]

at that time under the Spanish government *de facto*, through a mistake of the true boundary line; and that, as a general rule of law, the validity of the marriage must be tested by the *lex loci;* and that the party alleging its validity should show that it was valid by the customs and laws of the country.

But to apply the same rules and mode of proof to every case of foreign marriage which may be found laid down in the English and European courts, would be exceedingly oppressive and unjust. It was but a short time that this portion of the country was under the Spanish government, having changed more than once from France to Spain, and back again. The laws and customs of these distant colonies often differed greatly from those of the mother country, from sheer necessity. The governors, appointed by the king of Spain, had general absolute political powers, both legislative and executive. This colonial government has ceased to exist for near half a century. These edicts of the governor, and the customs of the province, are not preserved in any accessible shape or known locality. It would be useless to ransack the musty records of San Ildefonso for the appointment and powers of the governor, or seek for records of his temporary edicts, or to expect a modern Louisiana lawyer to testify to the fleeting customs and changing laws of a government defunct a half a century ago. It would be as reasonable to expect record proof of acts of parliament among the Winnebago Indians, as to suppose that the local customs and temporary edicts of the early Mississippi colonial governments should be found registered and enrolled, or stereotyped in books, like the laws of the different European states, which have undergone little change for centuries. To exact, therefore, in all cases, the same unbending mode of proof, would be hard and unjust, and would be establishing a rule which would bastardize one-half the descendants of the early settlers on the Mississippi.

The court cannot, therefore, consent to charge you, as requested by defendant's counsel, that the proof of the marriage of John Ormsby, Jun. with Lydia Swazey, is not sufficient, in law, to establish that fact.

On the contrary, if they believe the witnesses, that it was customary for protestants to be married by a justice of the peace, that such a regulation had been made by the governor, (who was the government,) at the request of the protestant immigrants, and that such marriages were held valid by the political power of the state, it matters little what opinion the catholic priests might have of the matter. It is not probable that ecclesiastics who hold marriage to be a sacrament, or religious ordinance, and, therefore, wholly within their control, would be disposed to uphold customs and laws so contrary to their prejudices and interests, although such marriages among protestants are sanctioned by the comity and laws of almost every catholic government in Europe, and reprobated by few, save the ignorant and fanatical rabble of Mexico.

[Phillips v. Gregg.]

I am of opinion, therefore, that from the history and circumstances of the country, it would be almost impossible to give evidence of a higher nature, tending to show a valid marriage fifty years ago, in the settlements on the Mississippi, and that, if the jury believe the testimony, they may be justifiable in pronouncing the marriage valid.   The very peculiar situation of this country at that time, (the territory being actually a portion of the United States, and claimed to be under Spanish authority by mistake of the true situation of the boundary line,) would render it very probable that the government *de facto* would, in the unsettled and uncertain state of the country, while the Americans were commencing settlements under claim of right, not be disposed to refuse the comity usually allowed by government to the conscientious scruples of persons of different religious creeds.   In such unsettled times, if it appears, from the testimony of ancient witnesses, (whether lawyers or not,) that marriages were made before a magistrate by the license of the governor *de facto*, which were common, and esteemed and reputed valid marriages at the time, it would matter little what view a catholic priest might be disposed to take of them; and yet I doubt whether even by the common law, the fruit of such a marriage would be treated as illegitimate; but it is unnecessary to decide that point at present.

The credibility of these witnesses is, of course, for the consideration of the jury.   If this connection was not intended or considered by the parties as a valid and binding marriage, but a mere temporary concubinage, of course the fruit of it could not inherit; but if it was celebrated as testified, and intended and treated by the parties for a time as a valid marriage, during which time Mary was born, the mere fact that after a separation had taken place, the wife may have married again, under the advice of a priest, who may have acted as her conscience-keeper, will not affect the legitimacy of the child.

If you find that this marriage was valid under these instructions, and that Mary Swazey is the legitimate child of John Ormsby, Jun., you will, of course, perceive that the plaintiffs will be able to recover according to their claim in this case, unless the defendants have shown some good defence.

They have set up two other grounds of defence:

1. That John Ormsby, Jun. was advanced by his father to his full share of his father's estate, and therefore had no claim to any further portion thereof.

If this be true in fact, it would constitute a good defence to the plaintiff's claim.   Is it supported by the evidence?

An advancement is an irrevocable gift by a parent in his lifetime to his child, on account of such child's share of his estate after the parent's decease.   Hengst's Estate, 6 *Watts* 86.

What are the facts in the case?   On the 1st April 1769, John Ormsby, Sen., entered three applications for adjoining tracts of

land, one in his own name, one in the name of his son John, and one in the name of his son Oliver. That he intended these applications for his two children, (who were very young at that time,) is evident from the fact that he suffered them both to treat them as their own. He took out no patents for them, himself, but left his sons to complete the titles on their respective tracts, by taking out patents when they came of age, which would show pretty clearly that he did not use his childrens' names for himself, but intended as a gift or advancement to each, of the money paid for them, in entering their respective applications. When Oliver came of age he paid the purchase-money of his, and got a patent; and John, when he came of age, being indebted to his father, conveyed his tract to his mother, (by whom it was afterwards sold,) and the purchase-money applied to the payment of John's debt to his father, after he (John) had left this country.

Now, wherein has John been advanced more than Oliver?—and what right has Oliver to say that John shall be charged with the advanced value of his tract, when it was sold to pay his debt to his father, as an advancement; and because Oliver retained his tract, he is to be charged nothing. I question, if Oliver ever thought of such a thing, and it was left to the ingenuity of the counsel for his heirs to make the discovery.

Besides, if a man having several children, and being owner of one or more tracts of land, should make a deed to one of his sons of his proportionate share of his father's estate, it should justly be called an advancement to that proportion. But, if a man, having two sons, should give one the one-fourth in value of his estate, and by the labour and improvements of that son, or from any other circumstance, that advancement should rise in value to be equal to the other three-fourths of the father's estate at the time of his death, the value of the advancement would be reckoned at the time it was advanced, and not at the time of the parent's death. Oyster *v.* Oyster, 1 *Serg. & Rawle* 422.

Again, if a parent should contract with A B for a tract of land for one of his sons, and pay the hand money, say 100 dollars, and leave his son to go on, pay the balance of the purchase-money, and complete the contract, and get his legal title, in calculating the value of the advancement to this son, it would be the money paid by the father when he made the contract, and not the whole value of the tract after it was paid for and improved by his son.

What did the father do more, in this case, for John? He paid 7 shillings 6 pence for the application and the surveyor's fees; 5 dollars, perhaps, for John, and left him to complete his title. He did the same for Oliver; and, if this be a correct view of the facts, I cannot see with what propriety the heirs of Oliver can set up this as a defence in this case, more especially after O. Ormsby took possession of the whole personal estate of his father, and never rendered any account.

2. But the last, and main point, relied on as matter of defence in this case, is the statute of limitations.

In order to gain a title by the statute of limitations, there must be a continuous, notorious, and adverse possession for twenty-one years. That Oliver Ormsby and his heirs have had the possession of this property for upwards of thirty years, is not denied; and the only question is, whether this was an adverse possession, claiming it as his own, in exclusion of his co-tenants. This is a question of fact for you to decide on the principles of law which shall be laid down to you by the court.

" The possession of one tenant-in-common, is *prima facie* the possession of his companion also, and it therefore follows, that the possession of the one can never be considered as adverse to the title of the other, unless it be attended with circumstances demonstrative of an adverse intent, such as demand, by the co-tenant, of his share of the rent and refusing to pay, saying he claims the whole; or when one joint tenant bade the other go out of the house, and he went out accordingly. On the same principle it was decided that although the entry of one is, generally speaking, the entry of both, yet if he enter claiming the whole to himself, it will be adverse." Lodge *v.* Patterson, 3 *Watts* 76.

When one tenant-in-common enters and takes the whole rents and profits for thirty or forty years, or even for twenty-one years, a jury may presume an ouster; and there might be cases when a jury ought to presume an ouster—as, when one tenant takes exclusive possession of the whole property, and the other stands by and sees him do it, makes no demand, especially if he be needy, and no reason can be assigned why, if he had any claim, he should not pursue it immediately; and there might be cases when one tenant-in-common might receive and appropriate all the rents for more than twenty or over thirty years, and yet a jury would not presume an ouster—as, when the children of a family are settled (as is so often the case in this country) over the face of the earth, and some of them are resident a thousand miles off, have no knowledge of the death of their ancestors, or have been purposely kept in ignorance of the rights by the son who takes possession; or when the party who takes possession, keeps an account of the rents received and expenses laid out, showing an intent to settle with the heirs when they shall appear, and many other like circumstances which may be easily imagined.

Let us endeavour to apply these principles to the cirumstances connected with this case.

At the death of John Ormsby, Sen., in December 1806, Mrs Gregg, one of the heirs, is married, and living with her husband—(it is not in evidence when her husband died)—Mary, the granddaughter, is a minor resident in Mississippi; Oliver Ormsby, the other heir, is resident in Pittsburgh, a man of business, living near the premises, and having land of his own adjoining, he takes out

[Phillips v. Gregg.]

letters of administration on his father's estate. Now it is a very common custom in this country for the executor or administrator to take possession of the land, as well as the goods of the deceased, especially if the other heirs are at a distance and settled in the world; and much more especially if the estate of the deceased should happen to be encumbered with debts; as it is better for all concerned that the rents should be applied to the payment of the debts, than that any portion of the estate should be sold; it not unfrequently happens that by general consent of the heirs, the rents are received by the administrator, and so applied; and this is so frequently done, that in some parts of the country it is a prevalent notion that the administrator has a right so to do; accordingly, we find that Oliver Ormsby takes possession of all his father's property and leases it out, and reserves the rents; and as his sister was living in the neighbourhood, (whose right to a share of the rents he could hardly be supposed to deny,) and yet no division is made or rents paid to her, it would render it very probable that the father's estate was in debt, and it was deemed proper that the rents should be appropriated to that purpose. Now, as I have stated to you, when one tenant in common enters into possession, it is considered the possession of all his co-tenants, unless he show, by some unequivocal act, that he entered for himself alone, and claiming the whole.

The presumption is, that every man acts honestly till the contrary is proved, or there be some evidence of a contrary intention. Now, if Oliver Ormsby had brought up some sham title to the whole estate—had set up a claim to it all, as his own—if he had even fraudulently confessed a judgment against his father's estate, and had the land sold, and thus got a title to himself—however wrongfully—this would have been clear evidence of intention to claim the whole, in exclusion of his co-tenants, and the statute of limitations would have made his bad title a good one. If he had made a partition with his sister, (Sidney Gregg,) either denying the legitimacy of his niece, or, in ignorance of her existence, this would have been evidence of his holding adversely to her claim, and the statute would have run. Even if he had returned the land of his father's estate to the assessor as his own, it might be a circumstance from which to infer that he intended to claim it as his own.

Have you any evidence of any acts of Oliver Ormsby tending to show that he entered adversely to the other heirs, or set up any claim to the exclusive ownership when he entered, or at any time after, before the year 1820, when he had the land assessed in his own name? The plaintiff's counsel called on defendants to produce the books of Oliver Ormsby, in order to see if he had not kept an account with the heirs of the receipts from these lands, and expenditures for improvements and repairs. They were not produced. If their contents would have shown anything to benefit defendants, it is not probable they would have withheld them.

X.—P

[Phillips v. Gregg.]

The taking out of this patent in trust for the heirs, and the taxing of these lands, as the property of Ormsby's heirs, up to 1820, although they are circumstances that might not be absolutely inconsistent with a claim in Oliver to the exclusive ownership; yet, in the absence of evidence of any unequivocal act evincing such intention, they are corroborative of the *prima facie* conclusion, or inference of the law, that this entry of O. Ormsby was not adverse, but enured to the benefit of his co-tenants.

The petition, in the orphans' court, given in evidence, if it had related to this land, and had been followed by a division of it between O. Ormsby and his sister, would have been conclusive evidence either of his ignorance or denial of his niece's claim, and of an adverse possession from that time, though if you believe the testimony, (as the niece was a married woman at that time, and has continued so ever since,) the statute would not be a bar. The petition shows, if not ignorance of his niece's existence or claim, yet that he did not feel certain enough of their existence to acknowledge them. One witness swears that he spoke to her concerning his niece, when she was a child, and it would seem not impossible, as it is evident, from the titles produced, that they had some knowledge of John's marriage, and not at all unlikely, that, as he communicated to his brother his joy at hearing that his wife had got a divorce from a catholic priest, and got married again; that the history of his previous connection with her was no secret, although, probably, the family may have always had some doubts as to her legitimacy, owing to this letter of John's about his wife's conduct; for in the letter of O. Ormsby, of March 12, 1825, to his niece, he neither affirms nor denies her legitimacy, seems evidently willing to admit her claims, if he can be satisfied on that point, and although he speaks of knowing of John's marriage by report, but denies that John acknowledged it, yet he speaks of having seen letters of his niece directed to his father and mother. By this letter, and that of March 1828, it evidently appears that he was much perplexed what to do on the subject. He expresses no intention of wronging his niece, or denying her claims, provided he is satisfied of her legitimacy; but as, by this time, the value of this property was beginning to appreciate very fast, he seems evidently disposed not to be too candid in letting her know the extent of her claims. He appears, also, by this letter, to have requested his friend (Mr Stockman) to forward any vouchers or papers which might tend to establish his niece's rights. And this Mr. Stockman swears that, after examining into the subject, O. Ormsby acknowledged his niece's claims, and hoped she could be induced to take some definite sum for her release of them. This may account, also, for his want of explicitness as to their amount in his letter.

In reviewing the whole circumstances of this case, the question must occur to almost every one, why has this estate remained so long unsettled? Oliver Ormsby surely never intended to take his

[Phillips v. Gregg.]

helpless sister's share without compensation. Why not some partition between them, or settlement of the estate, if they did not suppose there was some distant claimant which might disturb it, whose claim, if fairly substantiated, they did not feel disposed to evade?

In fine, as I have stated, the question of adverse possession is for you. The possession of one tenant in common is *prima facie* the possession of the other; but if you can find any unequivocal act of Oliver Ormsby, showing that he had denied the title of his niece, and intended to hold adversely to her, before May 1815, then the statute of limitations is a bar—if not, it cannot avail the defendants.

*Dunlop* and *Shaler*, for plaintiffs in error, on the subject of the evidence of marriage, cited *Story's Con. of Laws* 103; 1 *Eng. Ecc. Rep.* 365; 3 *Phil. Ev.* 58. On the subject of advancement, 4 *Serg. & Rawle* 333; 6 *Watts* 311; 5 *Rawle* 219; 2 *Wms. Ex'rs* 923, 937; 3 *Pr. Wms.* 317; 2 *Pr. Wms.* 441; 6 *Ves.* 721; 8 *Ves.* 51; 16 *Mass. Rep.* 202; 1 *Atk.* 632; 1 *Eng. Cond. Cha. Rep.* 444; 4 *Whart.* 524; 2 *Wash.* 928; *Sorin on Wills* 337, *pl.* 3, *sect.* 18; 1 *Serg. & Rawle* 312.

*Metcalf* and *Forward,* for defendant in error, on the first point, cited *Story's Con. of Laws* 109, *sect.* 118, 119, 120; *Recopilacion de leges de las Indias Lib.* 7, *tit.* 22, *Law* 3. On the second point, 1 *Serg. & Rawle* 442; 6 *Watts* 86; 17 *Mass. Rep.* 358.

The opinion of the court was delivered by

ROGERS, J.—The plaintiffs claim title under Mary Swazey, the daughter of John Ormsby, Jun., and Grace, daughter of John Ormsby, Sen., and the defendants under the heirs of Oliver Ormsby son of John Ormsby, Sen., who died seised of the premises. In deducing title, it becomes material for the plaintiffs to prove that Mary Swazey was the *legitimate* daughter of John Ormsby, Jun., and as such entitled to one-third of her grandfather's estate. On this arises one of the principal questions in the cause.

Mary Swazey was the daughter of John Ormsby, Jun., by Lydia, who was the daughter of Nathan Swazey. It has been proved by testimony which leaves the matter clear of any doubt, that John Ormsby, Jun., and Lydia Swazey, were married by a justice of the peace, and that Mary Swazey was the issue of the marriage. The marriage was celebrated in due form, within the limits of the present state of Mississippi, which at that time *de facto* was under the colonial government of Spain, although it has been since ascertained by commissioners appointed by this country and Spain, that the spot where the marriage took place was within the territory belonging to the United States.

These facts are proved by the father and mother of Mary Swazey, and by other ancient witnesses, who have been examined by the plaintiffs and defendant, and by the repeated acknowledg-

ment of John Ormsby, Jun., in his lifetime. Notwithstanding this mass of testimony, the defendants contend there is no legal proof of the legitimacy of Mary Swazey, and that consequently the plaintiffs are not entitled to recover. The general principle is, that between persons, *sui juris*, marriage is to be decided by the laws of the place where it is celebrated. If valid there it is valid every where. If invalid there it is equally invalid everywhere. To this rule, as to almost every general rule, there are well recognised exceptions, and among others may be classed those marriages celebrated in foreign countries by citizens entitling themselves, under certain circumstances, to the benefit of the laws of their own country. That a foreign marriage, valid according to the laws of the place where celebrated, is good everywhere also, seems to be a rule of universal application, I mean as recognized in England and in this country. But our courts have not established, *e converso*, that marriages of citizens not good according to the place where celebrated, are universally, and under all possible circumstances, to be disregarded. The best course unquestionably is, to be married according to the laws of the country where the marriage takes place, for then no question can arise. But if this cannot be done on account of legal or religious difficulties, the law does not say, "that citizens shall not marry abroad according to the forms and ceremonies recognized as valid and binding in their own country. The common law, under which we live, considers marriage in no other light than a civil contract; such a marriage as has been celebrated between these parties would be clearly good. Now supposing that the colonial laws of Spain viewed marriage as a sacrament to be celebrated only according to the forms prescribed by the catholic church, (of which, by the bye we have not a shadow of evidence,) still it may admit of a very serious doubt, whether, under the very peculiar circumstances of this case, the marriage would be held bad by the courts of this country, so as to bastardize the issue. The marriage took place between persons who were subjects of Spain *de facto* only, in a country, the boundaries of which were unsettled, and in dispute between Spain and the United States, both parties claiming it, and which was subsequently found, on accurate survey, to be in truth within our limits. But this is a question, which we are not bound to decide, as we are with the defendant in error on other grounds. The only point is, the manner the colonial laws of Spain, as to the mode of celebrating marriages, are required to be proved. It is an established principle that foreign laws cannot be judicially taken notice of; the well settled doctrine being, that no court takes judicial notice of the laws of a foreign country; but they must be proved as facts. In what manner, then, are they to be proved? and this, it is obvious, will vary according to circumstances. The general principle is, that the best testimony or proof shall be required that the nature of the thing admits of; or in other words, that no testimony shall

be received which presupposes better testimony attainable by the party who offers it. And this rule applies as well to the proof of foreign laws as other facts. In this, as in all other cases, no testimony is required which can be shown to be unattainable. Church *v.* Hulbert, 2 *Cranch* 237. Generally speaking, authenticated copies of written laws, or other public instruments of foreign governments, must be produced. They are required to be verified by the sanction of an oath, unless they are verified by some other high authority, which the law respects not less than the oath of an individual. 2 *Cranch* 238. The usual modes of authenticating, are by an exemplification of a copy under the great seal of the state, or by a copy proved to be a true copy, or by the certificate of an officer authorised by law, which certificate must itself be authenticated. Foreign unwritten laws, customs and usages, may be proved, and must ordinarily be proved by parol evidence. And the usual course is to make such proof by the testimony of competent witnesses instructed in the law, under oath. But although these are the usual modes of authentication, yet they may be relaxed or changed as necessity, either physical or moral, may require, where there is reason to believe they are unattainable, and where a rigid adherence to them may probably produce extreme inconvenience or manifest injustice. In short, the peculiar circumstances of the case must enter largely into the consideration of the question, of the competency of the evidence. In the first place it is a matter of no inconsiderable weight, that the adoption of the strict rule, in its application to the early settlers on the Mississippi, may jeopard the rights, and bastardize the issue of many of our citizens. It must be recollected that this marriage took place fifty years ago, at a period when the boundary line between the United States and Spain was in dispute and unsettled; and that the place where it was celebrated has been since ascertained to have been within our limits. It must not be forgotten, that the territory was in a state of transition from France to Spain, from Spain to France, and from France to the United States, for most of the time under a colonial or territorial government, nor is it certainly known whether or where the edicts of the governor or superintendants of those provinces are preserved, whether they are in the archives of France or of Spain, or whether they remain among the local records of the present state of Louisiana or of the state of Mississippi. It may be, and most probably is, impossible, to procure an authenticated copy of the edict or law by which marriage may have been regulated at that time within the colonial government of the Spanish monarchy. Nor will such proof be required; but it is contended that it might have been proved by the oath of witnesses instructed in the law; but whether the testimony of counsel, at the present day, as to the temporary edicts or fleeting customs of a colonial government which was ever in a state of fluctuation, and which has long since passed away, could be obtained; or if ob-

X.—P*

[Phillips v. Gregg.]

tained, would be more satisfactory than the testimony which has been procured, is not very clear. At this distance of time, better testimony of the facts of the marriage of obscure individuals cannot be expected. It is sufficient to satisfy the scruples of the most fastidious. Before the defendants can be permitted to allege that such proof should not be laid before the jury, it was incumbent on them, under the peculiar circumstances of the case, to show that there was better in existence attainable by the plaintiff:— that a justice of the peace was not authorized to celebrate marriages between persons who professed the protestant faith. It is very probable that a regulation, similar to one of which the witness speaks, was made by the local authorities. For in the documents collected by order of congress, we are informed, that the superintendant of the province of Louisiana was authorized to permit intermarriages between new settlers, and Spaniards of both sexes, with a view to the more easy incorporation with the natives. In that instance the laws of marriage were relaxed, and it is very likely that the conscientious scruples of protestant settlers were respected by the colonial government. The witnesses distinctly prove that it was customary for protestants to be married by a justice of the peace, that such a regulation had been made by the governor or superintendant, to whom the power was intrusted at the request of protestant emigrants, and that such marriages so celebrated were held valid by the political power of the state. Although it might be possible to give higher evidence than this of the marriage, yet it would be unreasonable to require it, as to a marriage celebrated between citizens of the country fifty years ago, in the settlements on the Mississippi. The only plausible exception which has been taken to the evidence is, that the testimony does not proceed from witnesses learned in law. But this objection is entitled to less weight as it respects the ceremony or validity of marriages, in which every citizen is so much interested, and with which in general they are so well acquainted. In Roman catholic countries, and in some protestant countries, marriage is treated as a sacrament, but in this as a civil contract. It is very likely it is held to be a sacrament in the colonial governments of Spain, although it is by no means improbable, that as the witnesses state, in the then Spanish province of Louisiana there was a relaxation in the laws favourable to the conscientious scruples of persons of different religious creeds.

The plaintiff in error also alleges, that John Ormsby, Jun. was advanced by his father in his lifetime to the full amount of his share of his father's estate.

The 1st of April 1769, John Ormsby, Sen. entered three applications for adjoining tracts of land; one in his own name, one in the name of his son John, and one in the name of his son Oliver, as whose heirs the defendants claim title. It is a general rule in equity, that when a man buys land in the name of another, and pays the

[Phillips v. Gregg.]

consideration-money, the land will generally be held by the grantee in trust for the person who so paid the purchase-money. But this doctrine must be taken with some exceptions, which are not inconsistent with the general principle. For when a parent purchases in the name of the son, the purchase will be deemed *prima facie* an advancement, so as to rebut the presumption of a resulting trust for the parents. The moral obligation of a parent to provide for his children, is the foundation of the exception; or rather, of the rebutter of the presumption; since it is not only natural, but reasonable, to presume, that a parent by purchasing in the name of a child, means a benefit to the latter, in discharge of the moral obligation, and also as a token of parental affection. In addition to the legal intendment, that the application was designed as gifts to his two sons, it may also be inferred, that such was his intention, from his subsequent conduct. He suffered his sons to treat the land as their own, took out no patents himself, but left them to complete their titles for their respective tenants, by procuring patents when they arrived at age. Oliver, when he came of age, paid the purchase-money for his tract, and obtained a patent in his own name, and for his own use. And John, when he came of age, being indebted to his father, and to others, conveyed his tract to his mother, (by whom it was afterwards sold,) and the purchase-money applied to the payment of his debts. This was after John had left the country. We are therefore fully warranted in saying, that this was a gift by the father to the son, of a tract of land, at the time of the application. Every fact in the cause leads us to the same conclusions. The conveyance from John to his mother was for a nominal consideration, and that it was with the assent and approbation of the father, is an inference which fairly results from all the circumstances attending the transaction, and with a full understanding that it should be sold, and the proceeds applied to the payment of the debts of John. For it appears, that the property conveyed to the mother was sold, and the proceeds passed to the credit of John, viz: the sum of 600 pounds, received from Culbertson, the purchaser. It cannot be viewed in any other light than the payment of a debt, out of the proceeds of property, understood and acknowledged to be the property of John. The father explains the transaction by an "N. B.," to be a memorandum of the different payments on his son John's account. There is nothing which indicates that he had made or intended a gift to his son of the sum of 600 pounds. It is an account stated, as debtor and creditor, between himself and son, in which he charges him with payments on his account, and credits him with money received in his character of trustee, or as the recipient of the money of the wife, who was the trustee. When we recollect the habits of John, his indebtedness to his father and others, connected with the subsequent conduct of the father in crediting the amount received, we cannot bring ourselves to believe that the conveyance was intended as a gift, to the mother, of the premises. We are constrained to think it

was designed for the honest purpose to which it was afterwards applied. It may have been that, at the time of the conveyance, John was not indebted to his father in the whole amount of the account, but there were debts then owing, and for which the father became responsible, and afterwards paid. If, then, this was intended as a gift by the father to his sons, it was an advancement to them, at the time of the application, to an amount equal to the sum, viz: seven shillings and six pence, actually paid by the father. The subsequent rise in the value of the ·property, caused by the improved condition of the country, cannot be taken into the account. The rule is *to* charge the child with the value of the thing at the time of the gift, and no better rule can be established to ascertain that value, than the amount which the parent has actually paid on account of the purchase. If a parent purchase land in the name of the son, and pay only part of the purchase-money, it will not be pretended that the son is bound to bring into hotch-pot more than the amount paid, whatever artificial or real value the land may have obtained at the time of the death of the parent.

As to the statute of limitations. In the charge of the court to the jury there is no error, nor in truth is there any error assigned; although the counsel, in the argument, took exception to part of the charge. In those exceptions he has totally failed. The law on this point is so well settled, that it would be a waste of time to examine particularly all the positions laid down by the court.

Judgment affirmed.