## Bannon *et al. versus* Brandon.

The widow of a tenant for life, who continues in possession, without any contract between herself and the owner of the land, holds in subordination to his title, and not adversely : she is, at least, a tenant at sufferance.

The subsequent marriage of such a widow does not change the character of her possession ; the second husband occupies the premises in right of his wife, and his possession, during her life, is in privity with the owner's title, and not adverse to it.

Where the entry of a party in possession has not been adverse, where he came in expressly or legally in subserviency to the title of the owner, he cannot be permitted to treat his subsequently-continued possession as adverse. Before the statute of limitations begins to run in favour of such an occupant, the privity between him and the owner must have been disowned, and severed by some unequivocal act ; an intent to hold adversely is not sufficient.

An attempt to purchase a better title does not affect an inchoate right previously acquired under the statute of limitations. It does not render the possession less hostile to the true title.

ERROR to the Common Pleas of *Venango county.*

This was an ejectment by Elliott Brandon against Wallace Bannon and others, for a tract of 400 acres of land in Sugar Creek township, Venango county.

The tract in question was originally surveyed to William Wilson, by virtue of a warrant dated the 19th March 1796. Wilson conveyed to David Mead and Oliver Ormsby, to whom a patent was issued on the 4th April 1801. In 1806, David Mead and wife conveyed their interest in the land to Ormsby.

About the year 1801, Oliver Ormsby placed James Bowles, an old soldier, upon the land, as his tenant. Bowles died in 1815, leaving his widow in possession ; and in 1817, the widow married John Peoples, and continued to reside with him upon the land until 1823, when she died.

John Peoples continued in possession until 1828, when he sold the land to Elliott Brandon, the plaintiff below ; from whom it was recovered in an ejectment by the heirs of Oliver Ormsby, commenced on the 7th June 1842. In 1822, Peoples attempted to procure a title to the land by causing it to be sold for taxes, and subsequently surveyed to himself upon his alleged settlement and improvement.

The plaintiff claimed title under John Peoples's alleged adverse possession ; the defendants showed title under the heirs of Oliver Ormsby.

On the trial, the plaintiff's counsel requested the court to charge the jury :—

1. Whether the entry of John Peoples upon the land in controversy, in 1817, and his subsequent possession thereof, was adverse,

[Bannon *et al. v.* Brandon.]

is a question of intention, and as such is to be determined by the
jury from his contemporaneous acts and declarations.

The court below (McCalmont, P. J.) answered this point in the
affirmative.

The defendants' counsel also presented certain points in writing,
upon which they requested the court to charge the jury, the 2d
and 3d of which were as follows:—

2. That if the tract was settled by James Bowles under Oliver
Ormsby, and he remained on it till his death, and then his widow
occupied, by herself or tenants, till she married John Peoples, and
returned with him on to the land again, neither Peoples nor any
one claiming under him can set up the statute of limitations as a
bar to defeat the title of Oliver Ormsby, or his heirs.

Answer.—" To the defendant's second point, we say this would,
in effect, make the case a question of law ; we think, under the
facts of this case, the question of adverse possession is for the
jury ; Abraham Selders, one of the defendant's witnesses, testifies
that Bowles said he had a right for life, and not his wife ; John
McCalmont, another of defendant's witnesses, testified that Orms-
by gave him authority to turn Charley Gordon off the land in
1816 or 1817 ; Gordon claimed to have permission from the
widow Bowles, who was not then on the land, and Gordon was
turned off in 1817 ; the same witness testified that Ormsby was in
Franklin in 1820 or 1821, and sent a line to Peoples, and it was
his impression that Ormsby went to see Peoples, and that Ormsby
then wanted Peoples to leave the place.   From this evidence it
appears, that it is a question for the jury whether Mrs. Bowles
and Peoples were not claiming adversely, and whether Ormsby
did not know of it ; and therefore the point is answered in the
negative."

3. That if John Peoples did contrive or manage to have the
land in dispute sold for taxes in 1822, and the same year procured
a survey to be made of 135 acres of it for himself upon his alleged
settlement and improvement, and at the same time, changed his
assessment from 400 to 130 acres, these acts of his, each and
severally, are evidence going to show that prior to 1822 he had
not been holding the land by an independent and adverse title,
but in subordination to some superior or supposed paramount title,
and that if such were the facts, the statute of limitations did not
commence to run until that year, and had not secured to him a
title, prior to the commencement of the former action of ejectment.

Answer.—" To the defendant's third point we answer : the land
was sold for the taxes of 1817, assessed in 1816 in the fall or
winter ; the facts stated in this point are for the jury ; his trying
to get a good title by treasurer's deed would show a hostility at
the time ; whether before that, or not, would throw very little light

[Bannon *et al. v.* Brandon.]

upon it; it is not inconsistent with an adverse claim for years, nor, on the other hand, with a claim then but begun."

. To this instruction the defendants excepted; and a verdict and judgment having been rendered for the plaintiff, the defendants sued out this writ, and here assigned the same for error.

*S. P. Johnson.* for the plaintiffs in error.—If the theory of the defence was correct, the plaintiff acquired no title under the statute of limitations, and he claimed no other. We contend:—

1. That Bowles occupied the land from 1801 to the time of his death in 1815, under and in subserviency to Ormsby. 2. That his widow continued that occupancy by herself or tenants during her widowhood, and upon her marriage with Peoples resumed her personal residence on the land by agreement with or permission of Ormsby, and in subordination to his title, just as she had occupied it with her former husband, making no claim during her life inconsistent with it. 3. That Peoples came into possession in right of his wife, and continued to hold as she held, claiming only his marital right of entry, until 1822, when he first evinced by overt acts, his hostile intentions towards the Ormsby title. 4. That his entry being solely in right of his wife, who held by title in privity with that of the rightful owner, the character of his subsequent possession could not be changed to one of hostility, by any acts or declarations of his alone, during the life of his wife, and his continued residence with her, so as to start the running of the statute in his favour: Hawk *v.* Senseman, 6 *S. & R.* 21; Mercer *v.* Watson, 1 *Watts* 330; Long *v.* Mast, 1 *Jones* 189–91; Hall *v.* Mathias, 4 *W. & S.* 331; Watson *v.* Gregg, 10 *Watts* 289; McMasters *v.* Bell, 2 *Penn. R.* 180; McGinnis *v.* Porter, 8 *Harris* 80; DeHaven *v.* Landell, 7 *Casey* 120; McCracken *v.* Roberts, 7 *Harris* 390–5; Hood *v.* Hood, 7 *Pittsburgh Leg. J.* 97.

*Church* and *Heydrich*, for the defendant in error.—Peoples was a stranger to Ormsby's title in every essential particular, and consequently his act of entry upon the land and subsequent occupancy of it was a question of fact for the jury, and whether adverse or hostile to that title depended upon his intention at the time, to be derived and determined by them from the contemporaneous acts and declarations.

All the authorities cited for the plaintiffs in error recognise the doctrine laid down by the court below, that the character of the possession under such circumstances as we have here, is for the jury to determine: *Angell on Limitations* 81–7; Jackson *v.* Harsen, 7 *Cow.* 323; Brown *v.* McCoy, 2 *W. & S.* 307 n.; App *v.* Dreisbach, 2 *Rawle* 305; Mehaffy *v.* Dobbs, 9 *Watts* 363; Jones *v.* Porter, 3 *Penn. R.* 132; Hinman *v.* Cranmer, 9 *Barr* 41.

[Bannon *et al. v.* Brandon.]

The opinion of the court was delivered by

STRONG, J.—Three errors have been assigned to the charge of the Court of Common Pleas in this case; we shall notice each, though not precisely in the order in which they have been assigned.

In the court below, the plaintiff, now defendant in error, set up a title under the statute of limitations, alleged to have been acquired prior to the 7th of June 1842. The contest was in regard to the point of time when the adverse possession commenced. From about the year 1801, until March 1815, the land had been in the occupancy of James Bowles, who held it as the tenant of Oliver Ormsby, under whom the defendants below claimed. In 1815, Bowles died, leaving his widow in possession. There was some conflict of testimony whether the arrangement between Ormsby and Bowles was that the occupancy of the land should be enjoyed under the former during the life of Bowles alone, or during the life of Bowles and his wife and the survivor of them. However that may have been, Mrs. Bowles continued in possession some time after the death of her husband, then put a tenant on under herself, for a period, never surrendered the possession to Ormsby, but married John Peoples in 1817, and lived with him on the property until 1823, when she died. Peoples continued to occupy until 1828, when he sold to Brandon, who continued the occupation by himself, or tenants, until he was turned out by an ejectment at the suit of Ormsby's heirs, commenced on the 7th of June 1842. The turning point, therefore, of the case was, in the question when, if ever, did Peoples's possession become adverse to the title of Ormsby. The defendant below requested the court to charge the jury " that if the tract was settled by James Bowles under Oliver Ormsby, and he remained on it till his death, and then his widow occupied by herself or tenants till she married John Peoples, and returned with him on to the land again, neither Peoples nor any one claiming under him can set up the statute of limitations as a bar to defeat the title of Oliver Ormsby or his heirs." The court answered this point in the. negative, and their answer is the second error assigned.

This point assumes that the lease from Ormsby ceased with the life of James Bowles, as was contended by the plaintiff below, and that the widow continued in possession without any express contract between herself and the owner. Its purpose was, therefore, to ask instruction as to what was the law on such an hypothesis of facts. Now it is clear that, after the death of Bowles, the widow's continuance in possession was in subordination to Ormsby's title, even though she had no personal contract with him, securing its continuance. She had entered by right under her husband, and when the right ceased, and she held over, she was at least a tenant by the sufferance. When Peoples married

her and came upon the land, his entry, of course, was not tortious, for it was in right of his wife, and was, therefore, subordinate to Ormsby's title.    His possession did not commence adversely, for having a right to enter in virtue of the tenancy at sufferance of his wife, the law presumes that he did so enter: McMasters *v.* Bell, 2 *Penn. R.* 180 ; and, his possession not having commenced adversely, it is presumed to have continued as it commenced, in privity with the owner.    When the widow married, she was holding the possession for Ormsby, and her marriage did not change the character of her occupancy.    Until her death, her possession, if continued, was virtually Ormsby's possession.    It is abundantly established, that where the entry has not been adverse, where he who sets up the statute of limitations came in expressly or legally in subservience to the title of the owner, he cannot be permitted to treat his subsequent continued possession as adverse. Before the statute commences to run in favour of such an occupant, the privity between him and the owner must have been disowned, severed by some unequivocal act.    In cases of co-tenancy, the principle has often been laid down, that before one co-tenant can avail himself of the statute against the other, he must have done some clear, positive, and unequivocal act of disloyalty, amounting to disseisin of the other owner.    Mere declarations will not suffice ; until such an act, his possession does not become adverse : Phillips *v.* Gregg, 10 *Watts* 158 ; Hart *v.* Gregg, *Id.* 185 ; and Watson *v.* Gregg, *Id.* 289.    The same rule has been applied in other cases than those of co-tenancy.    Thus in Cook *v.* Nicholas, 2 *W. & S.* 27, it was applied to a case where a widow having married again, continued with her second husband a possession for more than twenty-one years after the death of the first.    The second husband was not allowed to stand on such a possession, to defeat a recovery by the heirs of the first.    And this, because he was held to have come in under them, and not against their title.    So in Hall *v.* Mathias, 4 *W. & S.* 331, it was again held, that the entry of a widow upon the land of her deceased husband, claiming it as her own, and her continuing the possession thus taken for nearly thirty years, was no disseisin of the heirs ; that, to make it such, there must have been some plain, decisive, unequivocal act or conduct on the part of the widow, amounting to an adverse and wrongful possession and disseisin of the heirs.    In Long *v.* Mast, 1 *Jones* 189, the same rule was applied to the case of a tenant by the sufferance, who had held over for more than twenty-one years.    In Zeller's Lessee *v.* Eckert, 4 *Howard* 289, a case under the Pennsylvania statute of limitations, the rule was signally vindicated.    There the widow was, by the will of her deceased husband, authorized to continue the possession of the land eleven years after his death.    She married again within about nine months, resided upon the property about one year, and then

[Bannon *et al. v.* Brandon.]

left the possession; but her second husband and those claiming under him occupied it for thirty-five years, some twenty-five years after the right of entry of the owner accrued. It was held, that the possession of the second husband was in privity with the estate of the owners, even when not children of the first husband, and that nothing short of an open and explicit disavowal of a holding under that title, and assertion of title in himself, brought home to the owners, would make his possession adverse. Short of this, he was still to be regarded as holding in subserviency to the rightful title. Mr. Justice NELSON, in delivering the opinion of the court, remarked: "There are authorities maintaining the doctrine that a party standing in the relation of Eckert (the son of the second husband) to the title in question, is incapable in law of imparting an adverse character to his possession, and that, in order to deny or dispute the title, he must first surrender the possession and place the owner in the condition in which he stood before the possession was taken from him." While admitting that the law has been settled otherwise, he adds, "as the title was originally taken and held in subserviency to the title of the real owner, a clear, positive, and a continued disclaimer and disavowal of the title, and assertion of an adverse right, and to be brought home to the party, are indispensable before any foundation can be laid for the operation of the statute." "The statute, therefore, does not begin to operate until the possession, before consistent with the title of the real owner, becomes tortious and wrongful, by the disloyal acts of the tenant, which must be open, continued, and notorious, so as to preclude all doubt as to the character of the holding, or the want of knowledge on the part of the owner?" See also Yoder *v.* Yoder, 6 *Harris* 471.

In the light of these principles, how could the entry and possession of Peoples be a disseisin of Ormsby, during the life of Mrs. Bowles? And if not during her life, then only nineteen years of possession could be adverse before the ejectment was brought in 1842, the ejectment which dispossessed the grantee of Peoples. Until the death of Peoples's wife, Ormsby was in possession through her; she did no act, she made no declaration disavowing his title, and it is difficult to see how Peoples, her husband, could, without putting his own wife out of possession, while she acknowledged Ormsby's title. Had the occupancy been surrendered to Ormsby, and had Peoples subsequently gone on and continued to hold adversely, doubtless the statute would have run, but only from the time of such subsequent entry. But there was no evidence of such a surrender. At all events, the second point of the defendants below assumed, and, as we think, the evidence warranted the assumption, that there had been no such surrender, or anything equivalent to it, and asked what

[Bannon *et al. v.* Brandon.]

would be the law in its absence.  In our opinion, the point should have been answered in the affirmative.

The learned judge was of opinion that there were facts in evidence that justified his refusal to affirm the proposition.  We do not think so.  One of the witnesses testified that Bowles told him he had a right for life, and not his wife.  That is wholly immaterial to this question, for if the fact were so, Mrs. Bowles was still a tenant at sufferance after her husband's death, and the point propounded assumes no more.  Another witness testified that Ormsby told him to put Gordon (Mrs. Bowles's tenant) off, if he could get him off, and that he did get him off in 1817, but at the same time, Ormsby refused himself to bring a suit against Gordon. The testimony of this witness shows that Gordon was put off by the neighbours, because he was troublesome to them, not in order to terminate Mrs. Bowles' tenancy at sufferance, nor to restore Ormsby's actual possession.  The same witness testified, that Ormsby sent a line to Peoples in 1820 or 1821; that it was his impression Ormsby went to see Peoples, and that he wanted him to leave the place.  All this is utterly insufficient to warrant a jury in finding that the privity between Ormsby and Mrs. Bowles had ceased.  The assumption, therefore, of the defendants in their second point, was a justifiable one, and the law in regard to it should have been delivered to the jury as requested.

This view of the case also evidences that the plaintiff below was not entitled to an unqualified affirmative of his first proposition.  That proposition was that "whether the entry of John Peoples upon the land in controversy in 1817, and his subsequent possession thereof, was adverse, is a question of intention, and as such is to be determined by the jury from his cotemporaneous acts and declarations."

If Mrs. Bowles was a tenant at sufferance, in privity with Ormsby's title, and continued so until her death in 1823, John Peoples having married her in 1817, and gone upon the land, could not make his possession adverse by any mere intent which he may then have had.

We see no error in the court's refusing to answer the defendant's third point as requested.  Peoples's attempt to better his title in 1822, or to obtain another, could not injure an inchoate right which he may have previously acquired under the statute of limitations.  It certainly was not an acknowledgment of Ormsby's title.  In Owens *v.* Myers, 8 *Harris* 134, it was ruled, that the purchase of an outstanding claim, by one in possession, does not render his adverse possession less hostile to the true title, nor divest his title already complete under the statute of limitations.

The judgment is reversed, and a *venire de novo* awarded.