Bradley, J.
The question presented and litigated at the trial was whether the plaintiff became the wife of Otis N. Wilcox and was his widow. She was married to Edward Blackford in 1866, and they lived together in the city of Rochester until in the year 1876, when he left and has not since returned. And the plaintiff asserts, and there is evidence tending to prove, that he so went away in April of that year and that she has not since known him to be living. There also is some evidence to the effect that as early as in 1877 relations, friendly and somewhat intimate, existed, between her and Wilcox, who was a widower, also residing in the city, and that such relations thereafter continued. He died July 5, 1883. Her place of residence was on East avenue, where she resided until the spring of 1881, when she rented a house on Monroe avenue, opposite the house and place of residence of Wilcox on the same avenue, and she continued to reside there except a portion of the time, when she was in Cleveland, Ohio, until the spring of 1882, when she returned to her residence on East avenue. In July, 1881, they went together to Montreal. And it is claimed on the part of the plaintiff that a ceremonial marriage between them was had on board the steamship Toronto, then lying at the wharf of that city. In support of which the evidence of the captain, steward and second engineer of the ship is produced, to the effect that on the twenty-fifth day of that month three persons, two men and one women, came on board the vessel, and, by permission of the captain, and his direction to the steward, were shown through it; that one of the persons had the dress of a clergyman of the church of England; that when they were in the saloon of the ship the gentleman of the clerical appearance performed a marriage ceremony by which the other gentleman and the lady were apparently united in matrimony; that, although the steward and second engineer were not in the saloon at the time, they were at the entrance and did see what occurred, and heard a portion of the ceremonial service; that the gentleman of clerical appearance had what appeared to be a pocket prayer book from which he read; that the other two persons stood together in front of him, were respectively asked if they would take the other for husband and wife, and answered in the affirmative; and that the man placed a ring on her finger.
These two witnesses testify that the plaintiff was the woman, and, on being shown the photograph of Wilcox, that they recognize that as the photograph of the gentleman to whom she was married on that occasion. The person who performed the ceremony was a stranger to them. They have no means of knowledge that he was a clergyman *750 other than those furnished by the occasion—his dress and appearance—and no further information in that respect other than that derivable from inference is given by the evidence.' The marriage, as such, was void by the laws of Lower Canada, where it was contracted, or the marriage ceremony performed, because the plaintiff had been previously married to another who does not, by the evidence, appear not to then have been living. But, assuming that the plaintiff then had not for five years known him to be living, she could contract a marriage lawful in this state, and it would remain valid until its nullity should be judicially declared. 2 R. S., 139, § 6.
As a rule the laws of the place where the marriage is celebrated govern, and if lawful there, is valid everywhere, and if void there, is invalid everywhere. Phillips v. Gregg, 10 Watts., 158; S. C., 36 Am. Dec., 158; Medway v. Needham, 16 Mass., 157; Putnam v. Putnam, 8 Pick., 433; Van Voorhis v. Brintnall, 86 N. Y., 18; Thorp v. Thorp, 90 id., 602.
But that rule has its qualifications, and perhaps exceptions, which go in support of the marriage contract and relation in so far, that as between citizens of one country while in another, the marriage may be celebrated according to the laws of their domicile. Phillips v. Gregg, supra.
And although not solemnized in the manner required by law, may be treated as a contract to marry per verba de presenti, and treated as valid when followed by cohabitation, and by reason of such cohabitation. Newbury v. Brunswick. 2 Verm., 151.
The plaintiff and Wilcox were citizens of this state, and were only temporarily absent at the time of the alleged occurrence in Montreal, and evidently intended to return here. And in view of their domiciliary relation to this' state, the agreement made in Canada to take each other as husband and wife might characterize as connubial, cohabitation following it, and with it be effectual to constitute a marital relation; and if so followed by such cohabitation in good faith pursuant to and in performance of such contract in this state, such relation would seem to follow as the ' consequence. Substantially those propositions were submitted to the jury as questions of fact, and were found by them in the affirmative. '
While there are some circumstances and much evidence of witnesses quite inconsistent with the existence of such marriage contract and relation, we think the conclusion of the jury was permitted by the evidence, and that the court was justified in submitting upon it those propositions of fact to them. There is evidence tending to prove that shortly before the plaintiff and Wilcox went to Montreal *751 the latter stated to a witness that he was going to get married, and soon after his return he introduced the plaintiff as his wife to the same witness; that about two months after his return he requested a doctor to go and see his wife who was sick, and in reply to the doctor’s remark that he was not aware that he was married, Wilcox said he was, and that he married Mrs. Blackford; that the doctor attended her, and Wilcox paid him; that in the summer of and after his return from Montreal, Wilcox stated to a lady acquaintance that he and the plaintiff were married and requested her to call upon Nellie, the plaintiff, and this witness says she met him many times thereafter and talked with him about his wife or Nellie Blackford, as he called her; that in the spring of 1883, when a witness suggested to Yvklcox by way of inquiry that he supposed him a widower yet, the latter said no, he was married, and mentioned a name which the witness did not distinctly recollect, but sounded something like Blackburn; that Wilcox was frequently and at times daily at the house where the plaintiff with her children resided, and spent considerable portion of his time, and especially evenings, there; that he was apparently at home at her house, took meals, sat at the head of the table, waited upon those present, took part in the devotional exercises of the family, occasic nally wont to church and theatre with the plaintiff and some of the children, rode out with her sometimes, brought provisions to the house, assisted in arranging furniture, hanging pictures, etc.; and on one occasion when going towards the plaintiff’s house on East avenue he said he was on his way home. Whether he did or not usually or occasionally stay at the plaintiff’s house during the night does not appear, but there is evidence that on one occasion, in the evening, he went into her bedroom. These are in brief mainly the leading facts tending to show cohabitation. There are some other circumstances tending in the same direction, and. there is some evidence tending to prove intimacy between them morally consistent only with the marital relation. There does not appear to have been any public announcement that they were married or had assumed such relation. And several witnesses testify that on a number of occasions after the Montreal trip and up to about and after the time of the death of Wilcox, the plaintiff stated in substance and to the effect that she had not married him, and evidence is given of some other circumstances apparently not in harmony with such relation. She, however, by her evidence, contradicts substantially all the evidence of such declarations. Then her letters written him from Cleveland, Ohio, and the manner which they were addressed to him and signed by her, do not appear very *752 demonstrative of the matrimonial relation, nor did her omission to announce such relation in support of her attempt and right to visit him the last, days of his life and illness in the hospital. But she may have had, and the jury may have found reason for these things, or they may have deemed them subordinate to other and controlling considerations. It was their province tó measure the credibility of witnesses and weigh the force of the evidence so far as it was in conflict.
The general definition of “matrimonial cohabitation is the living together of a man and woman ostensibly as husband and wife.” 1 Bish. on Mar. and Div., § 77; Yardley's Estate, 75 Penn. St., 207; Pollock v. Pollock, 71 N. Y., 137.
This does not necessarily require the announcement further than it is given by the appearances of the purpose of the parties. There must be sufficient to fairly represent such relation by the manner in which the parties are living together. The fact that Wilcox kept rooms in his own house which he occupied a portion of the time at least, is a circumstance bearing upon the question of cohabitation, but is not necessarily inconsistent with it. Badger v. Badger, 88 N. Y., 546.
The purpose of parties so living together is an important element, and that the purpose is lawful and in performance of a matrimonial engagement may be inferred from adequate circumstances. The fact, when found, of the contract and formal ceremony attending it as testified to by the witness is significant of the then purpose of the plaintiff and Wilcox to assume the relation of husband and wife to each other, and goes to characterize their association following it as lawful and marital; if it takes the character of co-habitation, and may not, in the judgment of the jury, require so much by way of its reputation and publicity as would be deemed, necessary to produce the inference of a contract of marriage when no evidence of it other than cohabitation is made to appear. Allen v. Hall, 2 Nott & McCord, 114; 10 Am. Dec., 578; Arthur v. Broadnax, 3 Ala., 557; 37 Am. Dec., 707; Fenton v. Reed, 4 Johns., 52; Betsinger v. Chapman, 88 N. Y., 487; Hynes v. McDermott, 91 id., 451. Tho exceptions taken to the submission of the questions of fact before mentioned to the jury are not well taken. A physician who attended Mr. Wilcox in his last illness was called as a witness and asked by the defendant’s counsel whether he was able to form an opinion from time to time in regard to his mental condition apart from any information which he obtained from him for the purpose of his treatment. On his preliminary examination following the inquiry, it appearing that his interviews with Wilcox *753 and the attention given by the witness to his mental condition were solely for the purpose of medical treatment, the evidence was properly excluded. Code Civ. Pro., § 834; Grattan v. Metropolitan Ins. Co., 80 N. Y., 281.
For the purpose of identifying as Wilcox the person who was with the plaintiff and the clerical appearing gentleman on the vessel at Montreal, his photographs were presented to the witnesses who were there on that occasion, and they testified that they were the photographs of the person they saw there and who was the party to the marriage ceremony. The defendant’s counsel took objections and exceptions to this evidence, and insists that its reception was error. The photographs were not the original ones taken from the negative, but were copies taken by a photographer from the original. They were recognized by witnesses well acquainted with Wilcox in his lifetime as likenesses or portraits of him. The witnesses who testified that they saw those persons on the ship, seem to have taken some observation of this person, as they give some description of him. We think it was competent to permit them to refer to the photographs and testify whether or not they saw in them the likeness of the person they saw there. The fact that they were taken from the original, and, therefore, copies only, may not, and it seems did not, materially impair their representation of the appearance and likeness of Mr. Wilcox. There was no error in the ruling relating to this evidence. Ruloff v. The People, 45 N. Y., 213, 224; Udderzook v. Commonwealth, 76 Penn. St., 340; Hynes v. McDermott, 82 N. Y., 50.
The conversation between the plaintiff and one Scanlon at Montreal, as testified to by her, was not responsive to the question asked, and, therefore, not covered by the exception taken to the ruling permitting the question to be answered. And no motion was made to strike it out. There was no error in this ruling of the court.
After the death of Wilcox, amongst his papers was found a paper in his handwriting, purporting to be a letter or a copy of one to the plaintiff in answer to one from her, and of date January 30, 1881. This was offered in evidence by the defendant’s counsel and excluded. There is no evidence that such a letter was ever mailed or sent by him to her. It was not admissible as evidence. And the same remark is applicable to the exclusion of a statement of an account made by him' which it is .said purports to have some relation to his transactions with the plaintiff. There is no evidence verifying it in that respect.
In the fall of 1881, the plaintiff commenced an action or proceeding in the com" of common pleas of Cuyahoga county, in the state of Ohio, against her husband, Edward *754 Blackford, for a divorce which resulted in a decree to that effect January 21, 1882, And in an affidavit made by her in the proceeding, it is stated: “That she has not been able to learn his whereabouts or residence, and only learned that he was in the city of Philadelphia, Pennsylvania, in the fall of 1876.” That was within five years of the Montreal marriage engagement and ceremony. She having on the trial testified that .he absented himself in April, 1876, and had not since been heard of by her. . After the judgment record was put in evidence, she further testified that she did not made the statement in the affidavit, that she had learned Blackford was in Philadelphia in the fall of 1876 to any person, and did not know that it was in the affidavit. To the reception of this evidence exception was taken. And it is contended that this was error. Also, that the judgment-record is conclusive evidence that the plaintiff remained the wife of Blackford until the time of the entry of the decree of divorce. That record did not conclude her in respect to the fact stated in the affidavit, nor does the record, so far as appears, have the effect of an adjudication for any purpose. Blackford was not personally served nor did he appear in the proceeding. And there is no evidence that he was ever in the state of Ohio. People v. Baker, 76 N. Y., 78; O’Dea v. O’Dea, 101 id., 23.
Several letters of the plaintiff to Wilcox commencing in the year 1880, until in the spring of 1881, while she was at Cleveland, were put in evidence from which the defense claimed that the relation between them was not matrimonial, but meretricious in its purpose and effect. Upon that subject the court charged the jury that, “if those letters can reasonably bear the interpretation of innocence, can fairly bear the interpretation of an affectionate disposition existing between them and not an immoral connection, it is your duty to adduce that result from them.” And the defendant’s counsel excepted. .It cannot be said that the character of the relations, whether innocent or immoral, between the plaintiff and Wilcox, prior and up to July, 1881, was not an important element for the consideration of the jury upon the main questions of fact submitted to them as bearing upon the credibility of evidence given, the facts which it tended to prove and the inferences derivable from it. Relations, which are meretricious, cannot ripen into connubial relations, but are characterized as immoral, until a change of purpose is in some manner manifested. This change of purpose may not require direct proof to render relations innocent, but may be found in circumstances and inferred from them. Rose v. Clark, 8 Paige, 574: Caujolle v. Ferrie, 23 N. Y., 90; Badger v. Badger, 88 id., 546, 553-4. Whatever view the jury may have taken *755 of their relations prior to the trip to Montreal, if they found that the occurrence as testified to, took place there, they may well have found in that the purpose of the parties to make their relations matrimonial thereafter.
But in civil actions the rule upon which facts are supposed to be determined by juries is that of preponderance of evidence. And their duty does not require them to give the one party the benefit of the reasonable doubt or to find the facts involved only when it is in their judgment established beyond such doubt. 3 Greenl. Ev., § 29; Seybolt v. N. Y., L. E. and W. R. R Co., 95 N. Y., 562; Johnson v. Agricultural Ins. Co., 25 Hun, 251.
The presumption of innocence and of freedom from purposes and conduct immoral applies in civil as well as in criminal cases, and satisfactory evidence is required to establish the contrary. And when, in the judgment of the jury, the evidence is in equilibrio the imputation is not established. Star v. Beck, 1 Hill, 270; Pollock v. Pollock, 71 N. Y., 137.
This presumption is evidence only, and has its controlling effect as such until overcome by other evidence. And when the jury can fairly and reasonably construe the evidence so as to protect a party against charge of misconduct it may he a very proper thing for them to do, but when it may, in their judgment, reasonably be construed the other way as well, it becomes a matter for them to determine which direction they shall give to it rather than a duty imposed by law to find the fact in a particular way. The letters referred to furnished some evidence upon the question suggested in the charge, the determination of which involved the consideration of their meaning and import, and it is not clear that they could not be construed either way in that respect, in view of the evidence. And being so it was for the jury to give such effect to them as in their judgment the weight of the evidence as viewed by them fairly required. It seems that this instruction and direction was an invasion of the province of the jury, which, in view of the conflict of evidence upon which the finding of the main fact of the issue depended, cannot be disregarded.
We think this was the only exception well taken at the trial. And the result required by it renders the consideration of the motion for a new trial upon the alleged ground of newly discovered evidence unnecessary. The judgments and order should be reversed and a new trial granted, costs to abide event.
Smith, P. J., and Haight, J„, concur.