## Cadwalader *versus* App *et al.*

1. Penn in 1784 leased a lot to Wormley for ten thousand years, at an annual rent, with right of distress and re-entry to forfeit the lease in default of payment, if there were not sufficient distress on the premises to pay the rent. Wormley died in 1829 without known heirs; App then took possession of the lot; the plaintiff had been agent of Penn before Wormley's death, and so continued until 1838, when Penn's devisee conveyed to him the ground-rent and all the grantor's estate in the lot. No rent having been paid by Wormley, the plaintiff, July 1st 1839, entered for its non-payment, declaring his intention to resume possession. By arrangement with App, in order that plaintiff might make title to him, he removed everything from the lot, and continued in its occupancy to take care of it for plaintiff. In October 1839 App and plaintiff signed without seals, a paper by which App agreed "to take the lot," describing it, on a ground-rent of $60. *Held* that this paper was an agreement in writing, under the Statute of Frauds, for a lease of the land on ground-rent.

2. The requirements of the statute are met by a memorandum in writing, signed by the party to be charged therewith.

3. If signed by the vendor alone and delivered to the vendee no more is required.

4. It is not necessary that the writing be under seal nor in any particular form of words.

5. App paid rent till 1850, when he asked plaintiff for a deed and wanted it made to his son Samuel; afterwards Samuel, who occupied the lot, said to plaintiff, he would claim the property, that plaintiff had no title and his father would pay no more rent. *Held*, even if Samuel spoke by authority of his father, it was a mere declaration accompanied by no act and was not evidence of an adverse holding by App.

6. The Statute of Limitations does not begin to run in favor of one who has entered in subservience to the title of another until the privity between them is severed by some unequivocal act; mere declaration of his intention is insufficient.

7. April 24th 1851 App wrote to plaintiff that having failed to comply with his agreement to make him a deed for the lot, &c., "and said neglect * * * having continued for so long a time and after repeated demand, I notify you that I no longer recognise your title and will hold you accountable for the rent already paid you * * * under the claim set up by you," &c. *Held* that this was a disclaimer of any adverse holding prior to that date.

February 24th 1876.    Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia:* Of July Term 1874, No. 14.

This was an action of ejectment, brought April 22d 1872 by George Cadwalader against Samuel App, Ann Keen and Edward Zeitler. The sheriff's return was "summoned" as to Zeitler and Keen, and "nihil" as to App.

[Cadwalader *v.* App.]

The premises claimed in the writ were a three-storied brick dwelling-house and lot of ground, on the west side of Frankford road, below Otter street, in the Sixteenth Ward, Philadelphia.

The case was tried January 9th 1874, before Thayer, J.

The evidence of the plaintiff, and admissions of the parties, showed that on the 1st of July 1784, the title to the premises was in Mary Penn, wife of Richard Penn; also, lease dated that day from Richard Penn and wife, by their attorney in fact Tench Francis, to Scipio Wormley for ten thousand years, at an annual rent of $13.33, payable on the 1st of July; the rent being secured by a right of distress and a right of re-entry, in case no sufficient distress should be found on the premises.

Plaintiff further gave in evidence, deed from Richard Penn, devisee of Mary Penn, then a widow, dated April 1st 1839, to the plaintiff, for, amongst other things, the above rent-charge, payable by Wormley and issuing out of the premises in question, and also all reversions and remainders of the premises and all the estate, right, title and property, claim and demand whatsoever of Richard Penn, &c., of, in, to and out of the same and also of, in and to the said lot of ground out of which the rent issued; also, grant of administration of the estate of Wormley to David F. Foley, December 23d 1867.

The plaintiff having closed, the defendants called William Hodge, who testified that he had lived next door to the Apps in 1829. George App was a pumpmaker; he occupied Wormley's lot after his death; a brick house was built on the lot by Samuel App; the Apps have occupied the lot for forty years. Another witness testified that in Wormley's lifetime, George App used to draw logs out of Cohocksink creek on the back of Wormley's lot, and after Wormley's death he took possession of the lot and the house on it, which he tore down and put up a one-storied frame house; Samuel App occupied this as a shop; in 1835 it was torn down and a two-storied brick house was put up and occupied by Samuel. In 1852 that was torn down, and a three-storied brick house, at present there, was erected. George App occupied the lot until 1852, when he died. Samuel occupied the house until about 1870; after that his family had possession and rented it, and were in possession at the trial. Witness delivered the following note to plaintiff:—

"Mr. George Cadwalader.

"Sir:—I notify you, that having failed to comply with your agreement to execute to me a ground-rent deed for the lot of ground now in my possession, and for over twenty-two years occupied by me, situate on the west side of Frankford road, four hundred and thirty-three feet one inch south from Otter street, in the district of Kensington, said lot having a front on Frankford road of twenty feet by one hundred feet in depth; and said neglect or refusal to

[Cadwalader *v.* App.]

execute to me a proper deed of conveyance for said lot of ground having continued for so long a time, and after repeated demand, and I now notify you that I no longer recognise your title to the same, and will also hold you accountable for the amount of rent already paid to you for the said lot of ground under the claim set up by you, but which I now believe to have no foundation in law or equity.

"April 24th 1851.                                    GEORGE APP."

A number of other witnesses testified as to about the same facts; also that Samuel carried on the business of a jeweller in the different houses put up by the Apps on the lot; that App owned and occupied a lot adjoining Wormley's on the north.

Under objection by the plaintiff and exception, the defendants gave in evidence a deed for the Wormley lot from George App, Sr. to Samuel App, dated May 6th 1851. They gave in evidence also a deed dated May 24th 1821, from Mary Penn, by her attorney in fact Thomas Cadwalader, to George App, for his lot on the north.

The defendants closed their case in chief.

The plaintiffs, in rebuttal, gave in evidence the following agreement:—

"I, George App, do hereby agree to take the lot on Frankford road, twenty feet front by one hundred feet deep, adjoining my house to the south, on a ground-rent of three dollars per foot, equal to sixty dollars per annum, payable half-yearly, clear of taxes, from the first day of November, A. D. 1839.

                                    GEORGE APP, SR.,
Witness:                              GEORGE CADWALADER.
          T. C. CADWALADER.
Philadelphia, October 31st 1839."

Also the following letters:—

                              "Philadelphia, September 4th 1850.
"Dear Sir:—I will thank you to make the deed for the lot on the west side of Frankford road, now held by me, to my son Samuel App, of the district of Kensington, watchmaker. * * *
                                    GEORGE APP, SR.
General GEORGE CADWALADER."

                              "Philadelphia, April 18th 1851.
"Dear Sir:—I desire you to meet me at my house, 16 Frankford road, Kensington, on Monday morning next, at nine o'clock, in person.
                              Yours, &c.,
                                    GEORGE APP, SR.
Mr. GEORGE CADWALADER."

[Cadwalader *v.* App.]

Charles Zeiter testified as to the occupancy of the lot substantially as the defendants' witnesses had; he further said: "after Wormley died, George App went down to Cadwalader and rented the place. I know this, because George App himself told me that he had rented it of General Cadwalader. I believe he told me this on the same day that Scipio Wormley was buried. He told me that he had rented it."

D. F. Foley, who had been clerk for plaintiff from 1845 to 1865, testified that George App paid him ground-rent from 1845 to 1850; the ground-rent was $60 per annum. " At. the last payment, September 4th 1850, App requested that the plaintiff would furnish him with a deed for the lot; he said he wanted it made to his son instead of himself. After that he called and said his son was going to build, and he wanted his deed. Afterwards Samuel App told me he intended to claim the property, because he did not believe the plaintiff had any title. This was after the last payment of ground-rent by his father. He asked if General Cadwalader was prepared to give the deed. I said, ' No.' He then said, ' I want you to understand that my father will pay no more rent.' Afterwards I went to see George App, at the premises (in 1852, I think). I told Samuel App I wanted to see his father, to endeavor to arrange some means by which the property could be sold under an execution against Wormley, in order to perfect the title. Samuel App replied that neither he nor his father would aid General Cadwalader in any way in getting a title, as he believed General Cadwalader had no title to the property—to any of the property on Frankford .road, and that he would so advise his neighbors. Nothing further was said." * * *

The plaintiff testified: * * * "I used to go along·the whole square collecting rents. Mr. App was employed by me and by my father. All of the ten-thousand year leases, after ejectment suits had been brought for some of them, were treated as void, and App himself took a new deed. They all made new arrangements, except the Wormley lot; in every case, without exception. The reason why no new arrangement was made as to the 'Wormley lot was because Scipio was too poor. * * * When Scipio Wormley died, I called there and had a conversation with Mr. App in his yard. * * * He asked me whether he might pull this building down. I authorized him to pull it down. He asked me to let him have the lot on ground-rent. I explained to him the peculiarity of the title. He said he would take the lot at whatever the value was. Mr. App was a man of whom I had a good opinion, and I believe he would have kept his word. I wanted to accommodate him. I made a re-entry upon the' lot subsequently, by advice· of my brother, Judge Cadwalader. The testimony was not perpetuated. I made twenty or thirty re-entries in the neighborhood. I made a written demand for the rent, and read it aloud on

[Cadwalader *v.* App.]

the land.   I remained there as long as I could see to count money.
I then read another paper declaring that I re-entered upon the
property.   I took these papers, which were prepared by counsel.
I was then the agent for the property.   My father was the attorney
of Mary Penn.   The re-entry was made before I purchased the
property.   Another re-entry was made in July 1839.   George
App knew of the re-entry, because he knew it was to be done
under the advice of counsel, for the purpose of making title to him.
When this re-entry took place Mr. App said that he would not put
up any building until my counsel would say that the title was per-
fected.   The price at which App was to take the lot was fixed at
the lowest price at which property ruled along there.   He appointed
a time to meet me in my office, and we made a memorandum of it
on my book.   I had made the purchase in 1835.   There had been
a re-entry in 1834.   The witness was dead and the re-entry was
made again.   I then had become the owner.   The testimony was
not perpetuated.   It was considered that the outstanding title was
invalid.   App never paid any rent until he made the agreement.
He had the property rent free from 1829 to 1839.   App offered
to pay taxes, and he may have paid them, but the assessments
were not specific.   I can't say whether he or I paid the taxes.   I
paid the taxes during Scipio Wormley's time. * * * I saw George
App at various times casually; sometimes he was at my office.
Mr. App never asserted any adverse title in himself; he never
intimated anything of the kind."

On cross-examination he said : * * * "App asked my per-
mission to pull down the shanty immediately after Wormley's death.
App asked me to give him possession before Wormley's death.
App knew that Wormley was there only by permission.   App
asked me if I would not have Wormley's shanty pulled down.   I
think that there was a little shanty put there by App a little after
Wormley's death.   I never went in it.   It was a very insignificant
affair ; temporary thing ; never gave myself any concern about it.
The brick house was not put up for many years—many years from
the time when Scipio Wormley's hut was pulled down.   I was very
much astonished when I found that they were building there.   I
never saw any logs on Wormley's lot.   I knew that App had to
use the lot for long pumps.   There were whole rafts of logs along
there.   I never asked App for rent before 1838; he merely occu-
pied the Wormley lot on sufferance.   I made a re-entry in 1834.   I
made a demand on the premises.   I had a writing in my hand.
I made a demand of the amount due, as it was stated in that
book, and also the rent up to 1834.   There never had been any-
thing paid.   I made the demand on the 1st of July.   I waited
until dusk, and made a declaration in a form prepared by Mr. Bin-
ney and my brother, who were counsel.   I noticed that there was
nothing to distrain.   There might have been jewellery, but it was a

queer sort of jewellery shop. I looked to the best of my ability to see if there was anything from which I could get my rent, but there was nothing. There was nothing on the premises to distrain, that I could see; I did not go into the house. George App knew that I was going to make the re-entry for the purpose of making title. App had expressed a desire to buy the property.

"In 1839 I went through the same form. The difficulty was that I was practically in possession, and App was there to take care of the property for me. The entry was in the July previous to the agreement with App. * * * Mr. App understood the purpose of my coming, and he had purposely withdrawn everything from the lot. I saw nothing to distrain. The rent had been in arrear ever since 1784. App at various times requested me to give him a title. I considered the title I was going to give him a marketable title. He asked me for a deed. I told him I would sign any deed he would have prepared. App knew the title. He never asked me to give him a deed when he paid the money. He paid the money to Mr. Foley. I don't remember what reply I made to the note of September 1850. There was doubt in the minds of counsel as to the method of making title. I don't know that App ever pressed the matter. He knew that counsel had it under consideration. I would have signed any deed that George App had prepared. I did not go to see George App in response to his note of April 18th 1851. I did not go there. I may have sent Mr. Foley. I relied upon my deed from Mr. Penn."

The plaintiff then called for the counterpart of the lease for ten thousand years of the property adjoining the premises in question, and that on which George App had resided; and the counsel for the defendants, in response to the said call, said that "they had not that deed in court."

The plaintiff then made the following offer: "The defendant having offered in evidence deed of May 4th 1821, from Mary Penn, by her attorney Thomas Cadwalader, to George App, for the premises on the north; and the plaintiff having testified that all that square of ground was held under leases for ten thousand years, of which George App was aware, there being one of such leases covering the property conveyed by the deed of May 4th 1821; and the plaintiff having called upon the defendants to produce the original of such lease, and answer being made that they have it at home, and cannot therefore produce it, the plaintiff now offers the counterpart of such lease, dated July 1st 1784,— first, to corroborate the plaintiff's testimony; second, as being the best evidence of the lease, and thirdly, to show that App was, as the plaintiff testifies, aware of the state of the title to both the lots."

The defendants objected to the said lease being put in evidence, on the ground of irrelevancy. The court rejected the offer, and sealed a bill of exceptions.

[Cadwalader *v.* App.]

Defendants gave in evidence the assessment of the premises in 1836 to George App, Sr.

They also gave evidence that Samuel App had a jewellery shop on the premises about forty years previously, and had never less than $1000 worth of jewellery in the shop; the business was continued in the two-storied brick building; the logs on the lot were worth $400 or $500.

The following are points of plaintiff:—

2. If the jury believe that George App paid rent to the plaintiff from 1845 to 1850, the relation of landlord and tenant was thereby created between them, and the possession of the premises by App could not in law be considered as adverse to the title of the plaintiff.

3. There is no evidence that any change of this relation took place between the parties till the note of April 24th 1851, from George App to the plaintiff.

The second was affirmed; the third denied in the general charge.

The court charged:—  * * *

"Thus it would seem that the Apps, father and son, together have occupied the place from Scipio Wormley's death, in 1829, until the present time, a period of more than forty years—about forty-three years, calculating the time from Wormley's death to the bringing of the present action of ejectment. But the plaintiff insists that the Apps had no title, and that their possession has given them no title, and he seeks to recover upon the ground that he has a good title. Now it is my duty to tell you, in the first place, that it is incumbent on the plaintiff to make out his title before he can disturb the defendant. The defendant has a right to stand upon his possession—his naked possession—until somebody appears who shows that he has a better title. * * *

"The plaintiff's title is this: The property belonged originally to Mary Penn, the wife of Richard Penn, it having been allotted to her, in proceedings in partition, as a part of the estate of Thomas Masters.

"Mary Penn survived her husband, Richard Penn, and by her last will devised this lot to her son Richard Penn—I may call him Richard Penn, Jr. This Richard Penn made a conveyance to the plaintiff, George Cadwalader, on the 19th of October 1838. [What Richard Penn conveyed was not the land, but the rent charge of thirteen dollars and thirty-three cents, which was payable by Scipio Wormley, and which was reserved out of the land. When he conveyed this rent charge to the plaintiff he conveyed also with it all his interest and estate in the reversion and remainder] in the lot, and all his estate, right, title and interest in the land, and with it all the remedies for the recovery and enforcement of the rent reserved. As long as the lease for ten thousand years was in existence the right of possession was in the lessee and his assigns and representatives, and not in the owner of the land.

[Cadwalader *v.* App.]

The owner of the land could not acquire any right to the possession during the running of the lease, unless there was a forfeiture of the particular estate—the term for years. Now, has the plaintiff ever acquired the right of possession to the land? That is one of the important questions to be decided before we examine the defendant's title at all. He alleges that he has, and that he acquired it in due course of law, by a re-entry on the premises for the non-payment of the rent.

"It is one of the conditions of this deed which creates the lease for ten thousand years, that if this rent shall at any time be in arrear, and if a sufficient distress cannot be found upon the premises to pay the rent, then the lessor or his assigns shall be at liberty to re-enter, that is, to take possession again of the land, and to forfeit the particular estate which had been vested by the lease in the tenant; in other words, to destroy the lease which he had created, and to re-invest himself with the right of immediate possession to the land. The plaintiff says, that making use of that remedy he re-entered upon the land for the non-payment of the rent, and complying with all the conditions which were requisite to make such a re-entry, a good, lawful and valid re-entry, he thereby became invested with the right of immediate possession. * * *

"In the first place, there could be no good re-entry under this deed, if there was a sufficient distress on the premises to pay the rent in arrear. * * * A lessor who seeks to enforce a forfeiture for non-payment of the rent, by this old common-law remedy, must go upon the land the very day on which the rent is due. He must there demand the precise rent which is due, and he must do it in the most notorious place upon the land. He cannot go into a secret part of the premises and do it. * * * Then he must wait until dusk, to see if the tenant appears to respond to his demand for payment, and to save the forfeiture. If the rent is not paid, he must make a declaration that he thereby resumes possession of the land upon which he has entered. * * * If such a re-entry is properly made, * * * it destroys the leasehold or particular estate, and restores to him the whole estate, including the immediate right to possession and enjoyment. Now, one of the facts which you are to decide in this case is, was such a re-entry made in this case? That is one of the important questions in the case. Two re-entries are alleged to have been made on the premises—the first in 1834 and the second in 1839; the first in 1834, for the Penns, who were then the owners of the fee. The father of the plaintiff was the agent of the Penns, and the plaintiff entered under a power of attorney, substituting him in the place of his father as the attorney for the Penns, he made the re-entry in that capacity in 1834, as the attorney in fact, by substitution, for the Penns. What was done on that occasion? The plaintiff testifies that what was done was this:—

          *          *          *          *          *          *

[Cadwalader *v.* App.]

This is the plaintiff's account of what was done at the time these re-entries were made.

"On the other hand, I must say that it appears that notwithstanding the first entry was made in 1834, yet Richard Penn (for whom the entry was made), four years later, to wit, on the 19th of October 1838, conveyed this rent-charge to the plaintiff just as if no re-entry had been made at all. [He thus appears to have recognised the rent-charge as still existing and payable, and the plaintiff by accepting that deed seems to me also to have recognised the rent-charge as being outstanding.] The deed to the plaintiff seems to recognise the lease as outstanding in 1838, four years after the entry was made and four years after the lease is alleged to have been extinguished by the first re-entry. But the plaintiff testifies that another re-entry was subsequently made on the 1st of July 1839, and this time in his own right. * * * It was made, according to the plaintiff's evidence, in the same form as the entry of 1834. According to the plaintiff's testimony, the entry of 1839 was made in pursuance of an understanding with App, and in view of a contract which was to be made with App for the conveyance of the lot on ground-rent to him, which contract was subsequently made on the 31st of October 1839, four months after the second re-entry. * * * A good deal depends upon this question of a valid re-entry or not. The defendants contend that the re-entry was not good, chiefly upon the ground that there was a sufficient distress upon the premises; that Samuel App, the son, kept a jeweller's store in this house, which was upon the lot, and that one of the witnesses says that he never had less than $1000 of jewellery in his shop, and very frequently a much greater amount. * * * Whether there was or was not a sufficient distress on the premises is a fact entirely for you, which you are to decide upon all the evidence before you. If there was a sufficient distress the plaintiff then had no right to re-enter, and his re-entry is void, and [if void, the verdict in this case must be for the defendants, because he has not, in that case, the right of possession, the lease for ten thousand years being outstanding.] For although Scipio Wormley, the lessee, be dead, yet his rights have not passed to the plaintiff. They belong to his personal representatives, or, perchance, he has died without heirs, they may belong to the state by way escheat. * * *.

"The title of the defendant, Samuel App, is founded upon the alleged adverse possession of his father, George App; the deed from his father to himself, dated 6th of May 1851, and the alleged adverse possession of himself.

"Title by adverse possession is founded upon the Act of Assembly of the 20th of March 1785, which enacts that no person shall make entry into any lands after the expiration of twenty-one years next after his title accrued, nor shall any person maintain any writ of right, or any other real or possessory writ or action for any lands

[Cadwalader *v.* App.]

of the seisin or possession of him or his ancestors or predecessors, nor declare or allege any other seisin or possession of him or his ancestors or predecessors, than within twenty-one years next before such writ or action sued or brought.

"The bringing of an action after the lapse of twenty-one years since the right accrued is thus precluded. According to the construction which has been put upon this act by the courts of justice, the owner is barred by the Statutes of Limitations only where it happens that some person has been in *adverse possession* of the land during a period of twenty-one years, or where some person and those under whom he claims by color of title have been in possession for the space of twenty-one years, and in *adverse* possession. Where a person has been in adverse possession for twenty-one years a complete title is gained under the Statute of Limitations by the law of Pennsylvania; a title not only sufficient to support a defence, but sufficient also to enable him to recover as plaintiff in an action of ejectment. * * *

"Now, in order to make it out, it must be shown that the possession has been adverse. Every possession is not adverse, although it may continue for twenty-one years. A possession by permission or agreement of the owner is not an adverse possession. A possession in subserviency to the true owner, or under him, is not an adverse possession. A possession to be adverse, and to give a title under the Statute of Limitations, must, according to the well-settled law of this state, be atcual, continued, visible, notorious, distinct and hostile. By hostile I do not mean by force of arms; by hostile is simply meant that the land must be held for the man who is in possession, and under no subserviency to anybody else; that he must hold for himself, and that he must not be in by somebody else's permission; that he is in under a claim of title; that he recognises no superior title; that he is a claimant for himself. That is an adverse possession. A man who remains in possession of land twenty-one years, asserting his own title during all that period, is in *adverse* possession. The possession of a tenant under a lease cannot, during the continuance of the lease, be hostile. He is estopped during the lease from disputing the landlord's title or from asserting any possession adverse to his landlord. It follows from this that Scipio Wormley, the lessee, could not set up any adverse possession during his tenancy. Neither can the defendant, Samuel App, set up an adverse possession under Wormley during the continuance of Wormley's possession. Wormley was in possession, according to the uncontradicted evidence on both sides, until the day of his death. And during that period his possession could not be adverse to the Penns. Neither could George App, during that period, set up Wormley's possession as an adverse possession. Something has been said in the evidence in regard to George App using the back end of the lot to keep his logs on,

[*Cadwalader v. App.*]

during Wormley's time. That, as I have already said, may have been by the permission of Wormley. I recollect nothing in the case to show that it was not. But Wormley was himself then in possession and living in the house or the lot, and his possession was the possession of his landlords, Richard and Mary Penn. If the rightful owner is in actual occupation of part by himself or his tenant he is in constructive and legal possession of the whole. Wormley was in undoubted possession up to the time of his death, in 1829, and that was the possession of his landlords, the Penns. The real question, therefore, about possession begins with Wormley's death, in 1829, because it is quite plain that prior to that time no adverse possession can be pretended. Now, in regard to the subsequent possession, the evidence is that George App went into possession immediately after Wormley's death, in 1829. * * * George App had made a deed to his son Samuel for the property on the 6th of May 1851. George App himself died in 1852. Samuel has been in possession ever since.

"But the plaintiff alleges that if the possession of George App commenced in 1829, and if it was an adverse possession, which he denies, it was terminated first by the re-entry in July 1834; secondly, by the re-entering in 1839; and thirdly, by the contract of October 31st 1839, between the plaintiff and George App, by which George App agreed to take the lot upon a ground-rent of $60 per annum. The plaintiff agreed to convey it to him subject to such a ground-rent.

"First, as to the alleged re-entries of 1834 and 1839. * * * They have a double aspect, as you will perceive. I have considered already the effect of these re-entries upon the leasehold estate. * * * Now, you have to consider the re-entries in another aspect, and that is the effect of these re-entries upon the adverse possession which had been commenced in 1829, according to the defendant's allegation, by George App. These re-entries had the effect of ending the previous adverse possession, if they were made with the intention of making a legal claim to the possession with the intention of asserting title. To make a good entry which will interrupt an adverse possession, there must be an explicit declaration or an act of notorious dominion, by which the claimant challenges the right of the occupant. It must bear on the face of it, in other words, an unequivocal intention to resume the actual possession. When such a re-entry is made upon an adverse possession already commenced, the effect of it is to extinguish, as far as it has been acquired, the right acquired by adverse possession; because, when two persons are in possession at the same time, the law refers the possession to him who has the real and legal title. Therefore, when the re-entry is made by a legal owner upon an adverse possession already commenced, it destroys the adverse possession which has previously existed. * * * If a man should go

[Cadwalader *v.* App.]

upon a place which he claims, and walk across it, after the adverse possession had endured for years, that would not be a re-entry which would destroy the adverse possession. Even if he were to go in and talk over the matter with the person in possession, that would not be a re-entry which would destroy the adverse possession, unless he gave him to understand that he had come there to resume the possession. There must be some declaration or act which shows an unequivocal intention on the part of the person making the entry to resume the possession. When that happens the effect of it is instantly to extinguish the adverse possession up to that time. And that was the effect of these re-entries upon the adverse possession of George App, commenced in 1829, if the entry was accompanied by an explicit declaration or an unequivocal act showing that the plaintiff George Cadwalader intended then and there to resume possession of the land.

"Now, as to the effect of the agreement of the 31st of October 1839, between the plaintiff and George App. * * * This agreement amounted to a contract of sale. [It was a parol contract of sale, by which the plaintiff agreed to sell and George App agreed to buy the lot on ground-rent.] The plaintiff was to give App a deed, reserving a ground-rent payable by App. George App, it appears from the evidence, commenced to pay this ground-rent about six years after the date of the agreement. Why the payments were not sooner commenced we have no explanation; but the evidence is, that about six· years after the date of the agreement, he began to pay the ground-rent on this lot, the first payment being made on the 25th of October 1845; and he made various payments between that date and the 4th of September 1850, when the last payment was made. * * * This is an important date for you to remember. The aggregate amount of the payments altogether was $555. Then he stopped paying. On the day on which he made the last payment, viz., on the 4th of September 1850, he made a written request to the plaintiff for a deed to his son, Samuel App. It seems to have been totally disregarded. After that George App, according to the testimony of Mr. Foley, the plaintiff's clerk, told him that his son was going to build, and he wanted his deed made out. He wanted his deed, still he received no deed. On the 18th·of April 1851, he sent a written request to the plaintiff requesting him to hold a personal interview with him at his house. On the 24th of April, he sent him a formal written notice, that he would no longer recognise his title. After this, viz., on the 6th of May 1851, about eight months after he had called on the plaintiff to make a deed to his son for the lot, he conveyed the property to his son, as if he were the owner. In the following year, 1852, he died. The house now on the property was built in 1851, probably after Samuel App had obtained a deed from his father, and Samuel App has been in possession ever since.

[Cadwalader *v.* App.]

" Now, the effect of the contract of sale, made on the 31st of
October 1839, and of the subsequent payments by George App, was
to interrupt the previous adverse possession of George App, which,
it is alleged by the defendant, commenced in 1829, on the death of
Scipio Wormley, so that if the re-entry, to which I have referred,
did not interrupt that adverse possession, it was, nevertheless,
fatally interrupted by this agreement.   I cannot doubt that a man
who is in possession under a contract by which he agrees to become
a purchaser, cannot set up such a possession as an adverse posses-
sion.   The Statute of Limitations does not run in favor of one who
is in possession under a parol .contract to purchase.   But on the
other hand, although the adverse possession was interrupted by
this parol contract, and the new relations which it established
between the parties, yet George App had the undoubted right, if
the plaintiff refused to carry out the parol contract of purchase
and give him a deed, to rescind that contract, and to acquire,
thereafter, a possession hostile to the plaintiff, and to set up, there-
after, an adverse claim to the land.   Did he do so, and when did
he do so ?   That he did so no one can doubt.   But when did he
begin to do so ?   How soon, after his written demand for the deed,
on the 4th of September 1850, and his failure to get it, did he give
the plaintiff to understand by his conduct or his words that he
intended to hold adversely to him ?   That is a very material
inquiry, because, if there were twenty-one years of adverse posses-
sion between that date and the commencement of this suit, then
the title by adverse possession is fully made out, and the verdict
should be for the defendant.   If it is not made out, then your ver-
dict should be for the plaintiff.

" The plaintiff contends that this alleged adverse holding, which
commenced after the rescission of the parol contract, did not com-
mence until the written notice given by George App to the plain-
tiff on the 24th of April 1851, wherein he challenges the plaintiff's
title in writing.   The plaintiff contends that if there was any
adverse possession after the rescission of the contract of October 31st
1839, the written notice which has been given in evidence was the
commencement of it.   If that be so, then the adverse possession
lacks just two days of twenty-one years, which is the period of
adverse possession required to give a good title, for this suit was
commenced on the 22d of April 1872.   If the adverse possession
commenced only at the date of the note which George App sent to
the plaintiff, it would not be complete and ended until the 24th of
April 1872.   Two days more and undoubtedly the title, by adverse
possession, would have been complete in App.   But the plaintiff
says, and says truly, that if * * * the adverse possession lacked
two days of twenty-one years the defendant cannot claim the pro-
tection of the statute.   Therefore it becomes of great importance
to determine when, in point of fact, this last adverse possession

[Cadwalader *v.* App.]

did begin. [The plaintiff has requested me to charge you that there is no evidence of any change in the relations of George App to the plaintiff prior to the date of this written notice, given by George App to the plaintiff. But I decline so to charge you. I cannot so charge you, in view of the evidence, but I leave it to you to determine, as a question of fact, from all the evidence, in the case, *when* the adverse possession commenced.] * * * I refer particularly now to the evidence given by Mr. Foley, who says at the last payment of the rent, App requested that the plaintiff would furnish him a deed for the lot; he said he wanted it made to his son instead of himself, and that after that, he called again and said his son was going to build and he wanted his deed. Samuel App told me he intended to claim the property, because he did not believe the plaintiff had any title to it. This was after the last payment of ground-rent by his father. He asked if General Cadwalader was prepared to give him a deed. I said, 'No.' He then said, 'I want you to understand that my father will pay no more rent.' I consider it my duty, therefore, to leave it to you, as a question of fact, to say when that last adverse possession commenced. It was not necessary that George App should give the plaintiff a written notice of his determination to disaffirm the contract of October 31st 1839. It was sufficient if he communicated to him by unequivocal words or acts, his intention to disaffirm the contract, because he would not convey the land to him, to pay no more rent, and to retain the possession of the premises. The date at which he did that was the commencement of the adverse possession—a possession which might be continued by the son, who had a deed from his father; and if this adverse possession commenced, continued and endured for twenty-one years before the 22d of April 1872, when this writ issued, then it is an adverse possession, which under the Statute of Limitations confers a good title upon the defendant, and gives him a just claim to your verdict. But when this adverse possession commenced, how long it continued, and whether it existed full twenty-one years before the commencement of this suit, are questions of fact which I leave entirely to you."

The verdict was for the defendants.

The plaintiff took a writ of error, and assigned for error,

1. Rejecting the counterpart of the lease of July 1st 1784.

2. Declining to affirm the plaintiff's third point.

3. Leaving to the jury, as a question of fact, when the relation of landlord and tenant between the plaintiff and George App ceased and the adverse possession (if any) of the latter began.

4. Charging the jury: "What Richard Penn conveyed was not the lot, but the rent-charge issuing thereout; when he conveyed this rent-charge to the plaintiff, he conveyed with it all his interest and estate in the reversion and remainder."

[Cadwalader *v.* App.]

5. Charging the jury: "The plaintiff, by accepting the deed of 1838, seems to me to have accepted the position that no re-entry had been made at all before that time. It seems to be a kind of acknowledgment that the lease was still in existence."

6. Charging the jury: "If the re-entries were void, then the verdict must be for the defendants, because the lease is outstanding."

7. Charging the jury: "The contract of October 31st 1839, amounted to a parol contract for the sale and purchase of the land on ground-rent."

*G. T. Bispham* and *W. H. Rawle*, for plaintiff in error.—There are two capital errors in the charge: 1. In giving to the jury binding instructions to render a verdict for the defendants, in case they should find that the re-entries, proved to have been made by the plaintiff, were void; and 2. In leaving it to the jury to determine, as a question of fact, whether the adverse possession of George App began prior to his letter of April 24th 1851.

1. It was not for the jury to say whether the forms necessary to the legality of such re-entries were observed. The only possible question for the jury upon this branch of the case was whether there were enough goods upon the premises which could have been distrained for the rent. But even upon this point there could have been no open question, for it was an uncontradicted fact that both of these re-entries were made with the consent of George App, Sr., and with the express object of making a marketable title for him to buy. But if the re-entries were void, yet it was error to instruct the jury that in *that* event the plaintiff could not recover; because this was, in fact, an action by his landlord against his tenant, and therefore, it is impossible for the latter to deny the former's title. As against George App, who went into possession under General Cadwalader, the plaintiff was not bound to prove *title* at all. All that was required of him was to prove *possession under a contract* and a failure on the defendant's part to comply with his portion of the contract. A vendee under articles in possession cannot deny his vendor's title. If he wishes to do so, he must surrender possession: Graham *v.* Moore, 4 S. & R. 467; Jackson *v.* Hotchkiss, 6 Cowen 401; Jackson *v.* Ayers, 14 Johns. 224; Note to Duchess of Kingston's Case, 2 Sm. Lead. Cas. 745, &c. An adverse character can be given to a possession, which had been originally subordinate to the plaintiff's title, only by some clear, positive, and unequivocal act. Where he who sets up the Statute of Limitations came in expressly or legally in subservience to the title of the owner, he cannot be permitted to treat his subsequent continued possession as adverse. Before the statute commences to run in favor of such an occupant the privity between him and the owner must have been disowned—severed by some unequivocal act. Mere

declarations will not suffice; until such an act, his possession does not become adverse: Bannon v. Brandon, 10 Casey 267; Watson v. Gregg, 10 Watts 296; Long v. Mast, 1 Jones 189; Zeller v. Eckert, 4 Howard 289.

*J. D. Bennett*, for defendant in error.—The plaintiff having failed to enforce specific execution of this contract (Cadwalader's Appeal, 7 P. F. Smith 160), he cannot recover in ejectment: Vincent v. Huff, 4 S. & R. 298. A plaintiff, in ejectment, who has no title at the time of bringing suit, cannot recover, although a good title is conveyed to him before trial: McCullough v. Cowper, 5 W. & S. 427; Gilliland v. Hanna, Addison 251.

Mr. Justice MERCUR delivered the opinion of the court, May 8th 1876.

This was an action of ejectment. It was for a lot which Richard Penn and Mary his wife demised to one Wormley in 1784, for a term of ten thousand years, reserving a yearly rent of thirteen dollars and thirty-three cents, payable in Spanish milled dollars. The payment thereof was secured by a right of distress; and a right of re-entry was reserved, in case no sufficient distress should be found on the premises. Wormley continued in possession, and resided on the premises until his death in 1829. He left no known heirs. The plaintiff claims under deed of October 19th 1838, from Richard Penn. He was the son and devisee of Mary Penn, who owned the land when demised to Wormley. George App, under whom all the defendants claim, occupied the lot adjoining Wormley's. Probably during the latter part of Wormley's life, and with his permission, App occupied the back part of the Wormley lot, for depositing pump logs thereon, and soon after his death took possession of the whole lot. Prior to Wormley's death, the plaintiff acted as agent for Penn, and so continued until his purchase in 1838.

The uncontradicted testimony is, that in July 1839, the plaintiff made a re-entry with an unequivocal and declared intention to resume the actual possession; that he then and there gave the notices and did all the acts necessary to repossess the premises for the non-payment of rent, if there was not sufficient distress on the premises to pay the rent in arrear. The sufficiency of that distress was questioned on the trial. It appears, however, by the testimony of the plaintiff, that this re-entry was made in pursuance of an arrangement with App, and for the purpose of making title to him; that he had purposely withdrawn everything from the lot; he had paid no rent prior to 1838; that the plaintiff was practically in possession, and App was there to take care of the property for him.

Some three months thereafter, App entered into an agreement

31 P. F. SMITH—14

in writing with the plaintiff, for the lot, in these words: " I, George App, do hereby agree to take the lot on Frankford road, twenty feet front, and one hundred feet deep, adjoining my house on the south, on a ground-rent of three dollars per foot, equal to sixty dollars per annum, payable half-yearly in all cases, from the first day of November 1839. Philadelphia, October 31st 1839." It was signed by George App and by George Cadwalader, and by a subscribing witness.

The legal effect of this instrument is raised by the seventh assignment of error.

It has been held that the Statute of Frauds was passed for the protection of landowners. It was intended to guard them against prejudice in the proof of parol contracts. Hence the requirements of the statute are answered by a memorandum in writing signed by the party to be charged therewith. If, therefore, it be signed by the vendor alone and delivered to the vendee, it is all the statute requires: Lowry *v.* Mehaffy, 10 Watts 387; McFarson's Appeal, 1 Jones 503; Tripp *et al. v.* Bishop, 6 P. F. Smith 424; Johnston *v.* Cowan, 9 Id. 275. This writing was signed by both parties.

Nor is it necessary that the writing be under seal: Colt *v.* Selden, 5 Watts 525; McFarson's Appeal, *supra;* Tripp *v.* Bishop, *supra;* Johnston *v.* Cowan, *supra.* Nor is any particular form of words essential to its validity for the sale of lands: Colt *v.* Selden; McFarson's Appeal; Ross *et al. v.* Baker, 22 P. F. Smith 186.

This agreement fulfilled all the requirements of the statute. It is in writing and signed by the parties. The terms of the contract, the land to be conveyed, and the price to be paid, are all stated. The learned judge, therefore, erred in charging that this written agreement " amounted to a parol contract for the sale and purchase of the land."

The second and third assignments involve the sufficiency of the evidence to give title to the defendants under the Statute of Limitations. The answer depends on the effect to be given to the testimony of Foley. He was clerk to the plaintiff from 1845 to 1861. On the 4th of September 1850, he collected the last payment made by App, on his lease of October 31st 1839. That portion of Foley's testimony which does not clearly relate to events too late to affect the question, is in these words: "At the last payment App requested that the plaintiff would furnish him with a deed for the lot; he said he wanted it made to his son instead of himself. After that, he called and said his son was going to build, and he wanted his deed. Afterwards, Samuel App told me he intended to claim the property, because he did not believe the plaintiff had any title. This was after the last payment of ground-rent by his father. He asked if General Cadwalader was prepared

[Cadwalader *v.* App.]

to give the deed. I said 'No.' He then said, I want you to under-
stand that my father will pay no more rent."

Thus, the time when Samuel App declared his father would pay
no more rent is very vague and uncertain. The reason why, is
not given. It is more reasonable to presume the remark was made
to expedite the execution of the deed by the plaintiff than to indi-
cate an intention to hold adversely to him. Samuel did not allege
that he spoke by any authority from his father, or with his know-
ledge. He had no deed from his father until May 6th 1851.
George App indicated no hostile claim or adverse right when he
made the payment of the 4th September 1850. On the contrary,
both by his verbal request then made, as well as by his letter of the
same date, requesting the deed to be made to his son Samuel, he
most unmistakably negatived the idea of his claiming title para-
mount to the plaintiff's. After that, when he said his son wanted
to build, the same recognition of title in the plaintiff is clearly
manifested. There is no evidence that, prior to the 24th April
1851, George App gave any notice indicating a denial of the
plaintiff's title. That notice of the 24th April clearly assumes,
if it does not declare, that negotiations in regard to executing the
deed had been continued and open until that date. There is no
allegation that he, prior to that time, either personally or through
his son, discontinued those negotiations.

Still further, assuming Samuel to have spoken by authority
from his father, it was a mere declaration accompanied by no act.
It was not made when a payment was demanded. When one
has entered expressly or legally in subservience to the title of the
owner, the statute does not begin to run in favor of such occupant
until the privity existing between him and the owner is severed
by some unequivocal act. Until such act his possession does not
become adverse. Mere declaration of an intention is insufficient.
This rule was applied to co-tenants in Phillips *v.* Gregg, 10 Watts
158; Hart *v.* Gregg, Id. 185; Watson *v.* Gregg, Id. 289. But it
is held that the rule is not restricted to co-tenants. It applies
generally, whenever the title was originally taken, and held in
subserviency to the title of the real owner: Zeller's Lessee *v.* Eck-
ert, 4 Howard 289; Cook *v.* Nicholas, 2 W. & S. 27; Hall *v.*
Mathias, 4 W. & S. 331; Long *v.* Mast, 1 Jones 189; Bannon
*et al. v.* Brandon, 10 Casey 267.

Tested by the authorities we think the declarations of Samuel
App were insufficient to submit to the jury as evidence of adverse
possession by George App. It was not in his power, acting through
an agent, to make the Statute of Limitations begin to run in his
favor, while he at the same time, by his own personal conduct, was
continually recognising the plaintiff's title. His possession was
not adverse. To hold otherwise would be to sanction a fraud on
his landlord. His written notice of 24th April 1851 contains a

[*Cadwalader v.* App.]

disclaimer of any adverse claim prior to that date. He therein says, "I now notify you that I no longer recognise your title to the same." Up to that time he had recognised it ; but thenceforth he would not. As George App had unquestionably held under the plaintiff, and there is no sufficient evidence that he held adversely prior to his written notice, these assignments are sustained.

The fourth assignment is made by uniting disconnected parts of the charge. Considered in connection with the context, we see no error in the idea conveyed, nor do we think the language used in any wise injured the plaintiff. There are no substantial errors in the remaining assignments.

Judgment reversed and a *venire facias de novo* awarded.